**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Case No.  1:20-cv-327-EK-MMH** |
| **vs.** | |
| **SERGII "SERGEY" GRYBNIAK, and OPPORTY INTERNATIONAL, INC.,** | |
| **Defendants, and** | |
| **CLEVER SOLUTION INC.,** | |
| **Relief Defendant.** | |

**PLAINTIFF U.S. SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Nicholas C. Margida
Mark Oh
Kendra Kinnaird
U.S. SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549-5977
(202) 551-8504 (Margida)
(202) 551-4436 (Oh)
(202) 551-6709 (Kinnaird)
MargidaN@SEC.gov (Margida)
OhMa@SEC.gov (Oh)
KinnairdK@SEC.gov (Kinnaird)

*Counsel for Plaintiff*
*U.S. Securities and Exchange Commission*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ...........................................................................................................2

I.    Sergey Grybniak and Opporty International, Inc. ..........................................................2

II.   Defendants' Offers and Sales of Securities ...................................................................3

    A.    Defendants Announced and Promoted an ICO of Digital Assets and Solicited
         Investors in the U.S. and Globally ....................................................................3

    B.    In Promoting Opporty's ICO, Defendants Emphasized the Opportunity to
         Profit as a Result of Their Efforts ....................................................................4

    C.    Defendants Sold OPP Tokens Through SAFTs, Raising About $600,000 ...................5

    D.    In Fall 2018, After Cancelling the "Main Sale" of Opporty's ICO,
         Defendants Distributed OPP Tokens to Investors Who Had Executed SAFTs ...........6

    E.    OPP Tokens Had No Utility at the Time of the ICO or the Distribution....................7

    F.    Defendants Knew the ICO Could Be Considered a Securities Offering.....................7

    G.    Defendants Did Not Register the Offer and Sale of OPP Tokens or SAFTs ...............7

STANDARD OF REVIEW ...........................................................................................................8

ARGUMENT ..............................................................................................................................9

I.    The Undisputed Evidence Shows That Opporty and Grybniak Violated Securities Act Section 5......9

    A.    Defendants Offered and Sold Securities in the Form of Investment Contracts ...........11

        1.    Opporty Obtained an Investment of Money.................................................12

        2.    OPP Token Purchasers Invested in a Common Enterprise .............................13

        3.    OPP Token Investors Reasonably Expected Profits Derived from Defendants'
            Entrepreneurial and Managerial Efforts.................................................16

    B.    Grybniak Had "Substantial" Involvement in the Offering.....................................19

    C.    Defendants Cannot Establish a Valid Exemption from Registration .........................20

CONCLUSION ..........................................................................................................................25

**TABLE OF AUTHORITIES**

**Cases**

*Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036 (10th Cir. 1980) ................................16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................8

*Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067 (2d Cir. 1993) ....................................................9

*Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) ......................................passim

*Beranger v. Harris*, No. 18 Civ. 05054, 2019 WL 5485128 (N.D. Ga. Apr. 24, 2019) ........... 12, 13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................................8

*Delaney v. Bank of Am. Corp.*, 766 F.3d 163 (2d Cir. 2014) ...............................................8

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230 (2d Cir. 1985) .......18

*Geiger v. SEC*, 363 F.3d 481 (D.C. Cir. 2004) .................................................................23

*Glen-Arden Commodities, Inc. v. Constantino*, 493 F.2d 1027 (2d Cir. 1974) .......................11

*In re Barkate*, Release No. 49542, 2004 WL 762434 (Apr. 8, 2004),
     *aff'd sub nom. Barkate v. SEC*, 125 F. App'x 892 (9th Cir. 2005) .............................13

*Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986), *cert denied*, 480 U.S. 932 (1987) ................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ..............................9

*Powell v. Nat'l Bd. Of Med. Exam'rs*, 364 F.3d 79 (2d Cir. 2004) ......................................9

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) ................................................ 13, 15

*SEC v. Aaron*, 605 F.2d 612 (2d Cir. 1979), *vacated on other grounds*, 446 U.S. 680 (1980) ...........9

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) .................................................................19

*SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577 (2d Cir. 1982) ................................. 11, 16

*SEC v. Blockvest, LLC*, No. 18 Civ. 2287, 2019 WL 625163 (S.D. Cal. Feb. 14, 2019) ............................12

*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943)............................................................... 12, 16

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y. 1998) *aff'd* 155 F.3d 129 (2d Cir. 1998) .........................24

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) .................................................................9, 10, 20, 23

*SEC v. Cavanagh*, No. 98 Civ. 1818, 2004 WL 1594818 (S.D.N.Y. July 16, 2004) ............................ 10, 23

*SEC v. Chinese Consol. Benevolent Ass'n, Inc.*, 120 F.2d 738 (2d Cir.1941) ............................... 10, 19

*SEC v. CKB168 Holdings., Ltd.*, 210 F. Supp. 3d 421 (E.D.N.Y. 2016)...............................................10

*SEC v. Edwards* 540 U.S. 389 (2004) ......................................................................................... 11, 16

*SEC v. Greenstone Holdings, Inc.*, No. 10–cv–1302, 2012 WL 1038570 (S.D.N.Y. Mar. 28, 2012) ...........10

*SEC v. Hui Feng*, 935 F.3d 721 (9th Cir. 2019) .............................................................................16

*SEC v. Infinity Grp. Co.*, 212 F.3d 180 (3d Cir. 2000) ................................................................ 13, 15

*SEC v. Ishopnomarkup.com, Inc.*, No. 04-CV-4057,
    2007 WL 2782748 (E.D.N.Y. Sept. 24, 2007).................................................................... 9, 10

*SEC v. Kik Interactive*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) ...............................................passim

*SEC v. Martino*, 255 F. Supp. 2d 268 (S.D.N.Y. 2003) .................................................................22

*SEC v. Mattera*, No. 11 Civ. 8323, 2013 WL 6485949 (S.D.N.Y. Dec. 9, 2013) ............................... 24, 25

*SEC v. Merchant Cap., LLC*, 483 F.3d 747 (11th Cir. 2007)...........................................................11

*SEC v. NAC Found., LLC*, 512 F. Supp. 3d 988 (N.D. Cal. 2021) ......................................... 12, 16, 17, 18

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1952) ....................................................................9, 10, 20

*SEC v. Schooler*, 106 F. Supp. 3d 1157 (S.D. Cal. 2015),
    *aff'd in relevant part*, 905 F.3d 1107 (9th Cir. 2018);...................................................................9

iii

*SEC v. SG Ltd..*, 265 F.3d 42 (1st Cir. 2001) .................................................................... 13, 15

*SEC v. Shavers*, No. 13 Civ. 416, 2014 WL 12622292 (E.D. Tex. Aug. 26, 2014) ...................................... 12

*SEC v. Shields*, 744 F.3d 633 (10th Cir. 2014) ...................................................................... 11

*SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) .......................................... 12, 15

*SEC v. Verdiramo*, 890 F. Supp. 2d 257 (S.D.N.Y. 2011) ........................................................ 10

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ....................................................... 2, 11, 13, 16

*Simbsbury-Avon Preservation Soc., LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199 (2d Cir. 2009) ..................... 8

*Solis v. Latium Network, Inc.*, No. 18 Civ. 10255,
       2018 WL 6445543 (D.N.J. Dec. 10, 2018) ..................................................................... 12, 17

*Tcherepnin v. Knight*, 389 U.S. 332 (1967) .......................................................................... 11

*United Hous. Found., Inc. v. Forman*, 421 U.S. 837 (1975) ..................................................... 11, 16

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) ............................................................... 11

*United States v. Zaslavskiy*, No. 17 Cr. 647, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ................ 12, 15

*Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564 (10th Cir. 1991) .......................... 13

*Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241 (2d Cir. 2004) ...................................... 8

**Statutes**

15 U.S.C. § 77b(a)(1) ............................................................................................................... 11

15 U.S.C. § 77e ................................................................................................................. 1, 9

15 U.S.C. § 77o(b) ............................................................................................................... 19

17 C.F.R. § 230.152 ......................................................................................................... 24, 25

17 C.F.R. § 230.506(c) ....................................................................................................... 20, 25

17 C.F.R. § 230.901 ............................................................................................................... 21

17 C.F.R. § 230.901-905 .................................................................................................................20

17 C.F.R. § 230.902 .........................................................................................................................21

17 C.F.R. § 230.903(a) .....................................................................................................................21

17 C.F.R. § 501(a) ............................................................................................................................20

**Other Authorities**

*Facilitating Capital Formation and Expanding Investment Opportunities by Improving Access to
Capital in Private Markets*, Rel. No. 33-10884 (Nov. 2, 2020) ....................................................24

*Nonpublic Offering Exemption*, 1933 Act Release No. 33-4552,
27 Fed Reg. 11316, 1962 WL 69540 ..............................................................................................24

*Offshore Offers and Sales*, Securities Act Rel. No. 6863, 1990 WL 311658 (Apr. 24, 1990) .........................21

SEC Rel. No. 33-9415 § 4 (July 10, 2013) .......................................................................................22

*Statement of the Comm'n Regarding Use of Internet Web Sites to Offer Securities*,
SEC Rel. No. 33-7516, 63 Fed. Reg. 14,806, 14,809 (Mar. 27, 1998) ...........................................22

The Securities and Exchange Commission ("SEC") submits this memorandum of law in support of its motion for partial summary judgment against Sergii *a/k/a* Sergey Grybniak ("Grybniak") and Opporty International, Inc. ("Opporty") (collectively "Defendants"). For the reasons set forth below, the Court should grant the SEC's motion.

## PRELIMINARY STATEMENT

Defendants violated Section 5 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e, by conducting an offering of securities, in the form of digital assets called "OPP Tokens," without filing an SEC registration statement and without a valid registration exemption. From September 2017 to October 2018, Defendants conducted an initial coin offering ("ICO"), in which they sold OPP Tokens via purchase agreements called "Simple Agreements for Future Tokens" ("SAFTs"). Defendants raised approximately $600,000 from 194 investors in the U.S. and abroad.

Opporty's business model was to create an ecosystem or platform on its U.S. website (opporty.com) where U.S. businesses and their customers could use blockchain smart contracts to enter into agreements and transact business using OPP Tokens. To develop this platform, Opporty announced in September 2017 that it would sell OPP Tokens in an ICO.

The undisputed evidence shows that Defendants' ICO constituted offers and sales of investment contracts (a class of securities under the Securities Act), because: (1) Defendants obtained an ***investment of money***, in the form of digital currency called Ether, from the 194 OPP Token purchasers who executed SAFTs during Opporty's ICO "Pre-Sale" from February 5 to March 10, 2018, *see infra* at 12-13; (2) OPP Token purchasers invested money in a ***common enterprise***, pursuant to which Defendants pooled purchasers' investments, and the fortunes of Defendants and purchasers would rise and fall together, *see infra*, at 13-16; and (3) based on Defendants' public statements in soliciting the ICO, OPP Token Purchasers had a ***reasonable expectation of profits to be derived from entrepreneurial and managerial efforts of others***, most notably Defendants, who repeatedly

1

emphasized on Opporty's website and social media pages the actions they would take to increase OPP Token value, such as developing the platform and listing OPP Tokens on secondary trading platforms, *see infra* at 16-19. *See SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) (articulating elements of investment contract).

Because Defendants did not register Opporty's offers and sales of OPP Tokens, and because there was no applicable exemption from registration, Defendants violated Section 5 of the Securities Act as alleged in the Third and Fourth Claims in the SEC's Complaint. ECF No. 1 at 38-39. Accordingly, the Court should grant the SEC's motion for partial summary judgment.

**STATEMENT OF FACTS**

**I.  SERGEY GRYBNIAK AND OPPORTY INTERNATIONAL, INC.**

During the relevant period of September 2017 to October 2018, Grybniak lived in Brooklyn, New York, and was the sole owner and officer of Opporty, a Delaware corporation. *See* SEC Statement of Material Facts on Motion for Partial Summary Judgment Under Local Rule 56.1 ("SEC 56.1"), submitted herewith, ¶¶ 1, 2, 4. During that time, Opporty had no employees and operated through the efforts of Grybniak and contractors in the U.S. and other countries. *Id.* ¶¶ 5-6. Grybniak controlled Opporty: he was the sole decision maker and supervisor—he hired Opporty's contractors, set their compensation, and generally directed their work. *Id.* ¶¶ 7-8. Grybniak founded Opporty with the idea of creating an ecosystem for businesses and customers to interact through Opporty's platform hosted on its U.S. website, opporty.com. *Id.* ¶ 13. Defendants marketed Opporty's platform as an ecosystem where businesses could list their services and products, use blockchain smart contracts to enter into agreements with customers, and transact business using digital tokens. *Id.* ¶ 14.

## II.     DEFENDANTS' OFFERS AND SALES OF SECURITIES

### A.     Defendants Announced And Promoted An ICO Of Digital Assets And Solicited Investors In the U.S. And Globally

In September 2017, Opporty announced its plan to launch an ICO for the OPP Token, a digital asset to be used on its platform.  *Id.* ¶ 16.  The OPP Token is an ERC-20 token, the most widely used token on the Ethereum blockchain, a decentralized platform for digital money that includes "smart contract" functionality allowing for automated financial transactions like the kind envisioned for Opporty's platform.  *Id.* ¶¶ 16, 19, 20.[1]   Opporty stated publicly that its ICO would raise funds for the development of its platform.  *Id.* ¶¶ 21-22, 95.  For example, Opporty's White Paper posted on in website in September 2017 described Opporty's business model, platform development team, and plans for the ICO.  *Id.* ¶ 23-25.  The White Paper also stated the ICO would be held in two phases, the second of which would have a sales maximum of one billion OPP Tokens.  *Id.* ¶¶ 26-28.  Opporty also planned to issue up to 50 million OPP Tokens through a "bounty program," compensating third parties for promoting the ICO, including by posting positive articles on social media.  *Id.* ¶¶ 29-30.

Defendants promoted the ICO and solicited investors on Opporty's website, their social media platforms, and other online forums accessible in the U.S.  *See id.* ¶¶ 31-37.  For instance, Defendants made Opporty's White Paper, SAFT, and Private Placement Offering Memorandum ("PPM"), available on Opporty's U.S. website, which was accessible in the U.S.  *Id.* ¶ 32.  Defendants also promoted the ICO on their social media pages that were accessible in the U.S.  *Id.* ¶ 34.  Further, Defendants paid third parties to publish press releases and articles about the ICO on U.S. websites, including for example a September 25, 2017 article describing the structure of the ICO and its purpose in generating funds to develop Opporty's platform.  *Id.* ¶¶ 35-37.  Defendants also paid purported

---

[1]       Transactions involving digital assets are recorded and maintained on digital ledgers using blockchain technology, most often on a decentralized, publicly accessible ledger.  SEC 56.1 ¶ 17.  Cryptographically signed transactions denominated in digital assets are validated and grouped together in "blocks," and a "blockchain" comprises a chronological collection of these blocks.  *Id.* ¶ 18.

blockchain and digital asset experts and influencers in the U.S. to promote the ICO and touted these "advisors" in public statements about the ICO.  *Id.* ¶ 41-43.  Lastly, Grybniak promoted the ICO at U.S. digital asset conferences in January 2018.  *Id.* ¶ 38.  According to Opporty "[d]uring the events, many participants and attendees joined [Opporty's] whitelist" and Opporty consequently had "pre-commitments" for its ICO "in the amount of 8 million U.S. Dollars." *Id.* ¶ 39.  "Whitelist" participants committed to purchase OPP Tokens once they were made available during Opporty's initial phase or "pre-sale" of OPP tokens ("Pre-Sale"), in exchange for a 35% bonus to be paid in tokens.  *Id.* ¶¶ 40, 44, 60.

### B.   In Promoting Opporty's ICO, Defendants Emphasized The Opportunity To Profit As A Result Of Their Efforts

Throughout Opporty's ICO, Defendants publicly touted the opportunity to profit from purchasing OPP Tokens by describing how OPP Tokens' value would increase as a result of Defendants' efforts, and promising to list OPP Tokens on secondary trading platforms on which investors could resell their tokens.

*First*, Defendants publicly described how the value of OPP Tokens could increase, based on their platform development efforts.  *See id.* ¶¶ 69-78.  For example, on September 25, 2017, Defendants stated that the OPP Token's "initial value . . . will increase as the platform develops."  *Id.* ¶ 72.  On October 6, 2017, Defendants stated that "[t]he value of OPP tokens is supported by the value Opporty brings to its customers" and "Opporty's platform strives to expand its functionality, increasing the value of OPP tokens by introducing new features," while the "[v]alue of [OPP] tokens is not only stable but will rise with each step of Opporty's development."  *Id.* ¶¶ 73-75.  As Grybniak testified, it would be Opporty, not investors, contributing to "each step of Opporty's development," and any "new features" that would support OPP Tokens' value would be implemented only by himself and Opporty.  *Id.* ¶¶ 76-78.

4

*Second*, throughout the relevant period, Defendants told potential investors that OPP Tokens would trade on online trading platforms after they were issued, *id.* ¶¶ 80-82, and Defendants pursued relationships with several such platforms, *id.* ¶¶ 80, 85-86. Indeed, in a February 7, 2018 Bitcointalk.org post, Opporty claimed that it had already been "accepted" by the trading platform Liqui, and that it was "talking to" at least two other trading platforms." *Id.* ¶ 85.

Throughout the ICO, Defendants repeatedly emphasized the actions they took and would take to make Opporty's platform successful and thereby increase the demand for, and hence the value of, OPP Tokens. *See id.* ¶¶ 90-98. For example, Opporty's White Paper claimed OPP Token value was "supported by the growth of the Opporty community," and "tied to the overall value of Opporty['s] services and to services provided at Opporty by third-party vendors and contractors." *Id.* ¶ 70. Also, the PPM provided that ICO proceeds would "be used by [Opporty] to develop the technology supporting" its platform and "to build-out the decentralized network powered by blockchain and OPP token." *Id.* ¶¶ 92, 95. By contrast, Opporty told investors they would have no role in platform development and "no voting, management or control rights or other management or control rights in Opporty." *Id.* ¶¶ 102-103.

### C.     Defendants Sold OPP Tokens Through SAFTs, Raising About $600,000

Opporty's Pre-Sale began on February 5, 2018, and between then and March 10, 2018, Opporty sold over 9.6 million OPP Tokens to 194 purchasers in the U.S. and abroad, raising approximately $600,000 from the Pre-Sale. *Id.* ¶¶ 52, 130. The proceeds were sent by investors to Opporty's digital wallet accounts on the Ethereum blockchain. *Id.* ¶ 131.

In the Pre-Sale, Opporty offered and sold the right to receive OPP Tokens in the future, pursuant to purchase agreements called SAFTs. *Id.* ¶ 46. Under Opporty's SAFT, investors would automatically receive OPP Tokens upon Opporty's public release of its "minimum viable product", a determination by Defendants that Opporty's platform met certain functionality requirements,

including that users would be able to use the platform to receive, use, and purchase OPP Tokens, and to enter into decentralized escrow smart contracts. *Id.* ¶ 53. Each of the 194 OPP Token purchasers executed a SAFT, and Grybniak signed each SAFT on behalf of Opporty. *Id.* ¶ 56. The SAFTs were identical for all U.S. and foreign investors. *Id.* ¶ 57. After executing the SAFT, investors had no further investment decision to make to receive OPP Tokens. *Id.* ¶ 55. Pursuant to the SAFT's terms, each investor purchased OPP Tokens at a price of 0.0002 ETH per token. *Id.* ¶ 58. In addition to the 35% "whitelist" bonus, investors could receive additional bonus OPP Tokens of up to 90% of their purchase amounts, depending on the timing, amount of the investment, and holding-period length. *Id.* ¶¶ 59-60.

To execute the SAFT, all investors were required to go to Opporty's website. *Id.* ¶ 61. From there, investors were required to undergo one of two verification procedures. *Id.* ¶ 63. U.S. investors were routed to a third-party website to undergo verification for accredited investors, *id.* ¶ 64, while foreign investors went through a "know your customer" process to confirm their identity, domicile, and other basic information not included in the accreditation verification, *id.* ¶¶ 66-67.

### D. In Fall 2018, After Cancelling The "Main Sale" Of Opporty's ICO, Defendants Distributed OPP Tokens To Investors Who Had Executed SAFTs

After the Pre-Sale, Defendants continued soliciting investors for "phase two" or the "main sale" of the ICO. *Id.* ¶¶ 104-105. However, after multiple postponements, Opporty announced in late October 2018 that there would be no main sale. *Id.* ¶¶ 106-107. Instead, Defendants listed OPP Tokens on the BTCEXA, a digital asset trading platform in Australia. *Id.* ¶¶ 87, 107. At the same time, Defendants announced Opporty's platform had achieved "minimum viable product" status and they would begin distributing OPP Tokens to SAFT participants whose holding periods had ended. *Id.* ¶¶ 108-109. On October 31, 2018, Opporty began distributing OPP Tokens, and ultimately distributed over 9.6 million tokens, to Pre-Sale participants. *Id.* ¶¶ 109-111. Opporty distributed another 1.7 million tokens to bounty program participants a year later. *Id.* ¶¶ 114-115.

### E.   OPP Tokens Had No Utility At The Time Of The ICO Or The Distribution

During the ICO and even at the time tokens were distributed, OPP Tokens had no utility.  *See id.* ¶¶ 117-121.  For example, until at least February 2019, Opporty's platform did not have the functionality to enable businesses to transact with each other, *id.* ¶ 119, or enable businesses and consumers to transact business with each other in OPP Tokens, *id.* ¶ 120.

### F.   Defendants Knew The ICO Could Be Considered A Securities Offering

Defendants knew that Opporty's ICO could constitute offers and sales of securities, as illustrated by Opporty's offering materials and the Form D it filed with the SEC.  *See id.* ¶¶ 122-129.  For example, Opporty's PPM disclosed the "significant" risk that "[t]he issuance of OPP Tokens May Constitute the Issuance of a 'Security' Under U.S. Federal Securities Laws," *id.* ¶ 123, and it cited the SEC's Report of Investigation concerning DAO Tokens, summarizing the SEC's view that digital assets may be securities and that the federal securities laws and registration requirements "apply to those who offer and sell securities in the United States . . .  regardless whether those securities are being purchased using U.S. dollars or virtual currencies," *id.* ¶ 124.  In addition, Opporty's Form D, which Grybniak signed, acknowledged that Opporty had sold "$550,000" via a securities offering, specifically the "[s]ale and issuance of rights to receive the company's tokens in the future via a Simple Agreement for Future Tokens."  *Id.* ¶¶ 126-128.

### G.   Defendants Did Not Register The Offer And Sale Of OPP Tokens Or SAFTs

Defendants never filed a registration statement with the SEC for their offers and sales of OPP Tokens or SAFTs.  *Id.* ¶ 68.  Instead, they claimed in the Form D that Opporty's securities offering was exempt from the SEC's registration requirement "under a claim of federal exemption under Rule 506(c) and/or Regulation S under the Securities Act of 1933."  *Id.* ¶ 129.

The SEC filed this civil action on January 21, 2020, alleging that Defendants carried out an unregistered and fraudulent securities offering in violation of Section 5(a) and 5(c) of the Securities

Act (securities registration provisions) and Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder (anti-fraud provisions).  ECF No. 1.  As set forth below, there is no genuine dispute that Defendants conducted an unregistered securities offering without a valid registration exemption, in violation of Section 5.[2]

## STANDARD OF REVIEW

A court "shall grant summary judgment" if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under governing law," and a factual dispute is "genuine" only if the evidence could support a jury verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014).  In doing so, however, the court does not give the non-moving party the benefit of "mere speculation or conjecture as to the true nature of the facts."  *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986), *cert denied*, 480 U.S. 932 (1987).

The movant has the initial burden of coming forward with evidence sufficient to entitle the movant to relief as a matter of law.  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  Once the movant meets its initial burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Simbsbury-Avon Preservation Soc., LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  While the non-movant carries "a limited burden of production," it "must 'demonstrate more than some metaphysical doubt as to the material

---

[2] Although the SEC is not moving for summary judgment with respect to its fraud claims, the evidence, though disputed, will overwhelmingly establish those claims at trial.

facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Powell v. Nat'l Bd. Of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) (quoting *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations and citation omitted).  Additionally, "[i]n an SEC enforcement action, once the SEC has made out a *prima facie* case of the sale of unregistered securities, the burden shifts to the defendant to introduce evidence supporting its affirmative defense."  *SEC v. Schooler*, 106 F. Supp. 3d 1157, 1161 (S.D. Cal. 2015), *aff'd in relevant part*, 905 F.3d 1107 (9th Cir. 2018); *see also SEC v. Ishopnomarkup.com, Inc.*, No. 04-CV-4057, 2007 WL 2782748, at *3 (E.D.N.Y. Sept. 24, 2007) (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1952)).

## ARGUMENT

## I.    THE UNDISPUTED EVIDENCE SHOWS THAT OPPORTY AND GRYBNIAK VIOLATED SECURITIES ACT SECTION 5

Sections 5(a) and (c) of the Securities Act make it "unlawful for any person, directly or indirectly" to "sell," "offer to sell" or "offer to buy," a "security" unless a registration statement is in effect or has been filed as to such security.  15 U.S.C. §§ 77e(a), (c).  "The registration statement is designed to assure public access to material facts bearing on the value of . . . securities and is central to the [Securities] Act's comprehensive scheme for protecting public investors."  *SEC v. Aaron*, 605 F.2d 612, 618 (2d Cir. 1979), *vacated on other grounds*, 446 U.S. 680 (1980).  To prove a violation of Section 5, the SEC must show: (1) that no registration statement was filed or in effect as to the transaction, and (2) that the defendant directly or indirectly sold or offered to sell the securities (3) through interstate commerce.  *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).  So long as a defendant's participation is shown to be "substantial, not de minimis," an individual who authorized or directed the issuance of securities, like Grybniak here, "can be held liable if he has 'engaged in steps necessary to the distribution of [unregistered] security issues.'"  *SEC v. Greenstone Holdings, Inc.*, No.

9

10–cv–1302, 2012 WL 1038570, at *11 (S.D.N.Y. Mar. 28, 2012) (quoting *SEC v. Chinese Consol. Benevolent Ass'n, Inc.*, 120 F.2d 738, 741 (2d Cir. 1941)); *see also SEC v. CKB168 Holdings., Ltd.*, 210 F. Supp. 3d 421, 452 (E.D.N.Y. 2016) (indirect participants in offering are "liable if, but for their involvement, the sale transaction would not have taken place," and where "the defendant's acts were a substantial factor in the sales transaction").

The SEC need not show that a defendant acted with scienter. *CKB168 Holdings*, 210 F. Supp. 3d at 451 n.34 ("A violation of Section 5 is a strict liability offense" and "[t]hus, the SEC does not have to show that the defendants violated Section 5 with scienter."). Good faith is therefore not relevant to whether there has been a primary violation of the registration requirements. *SEC v. Verdiramo*, 890 F. Supp. 2d 257, 271 (S.D.N.Y. 2011) (citing *SEC v. Cavanagh*, No. 98 Civ. 1818, 2004 WL 1594818, at *16 (S.D.N.Y. July 16, 2004) ("*Cavanagh II*").[3] "Once a prima facie case has been made, the defendant bears the burden of providing the applicability of an exemption." *Cavanagh*, 445 F.3d at 111 n.13. (citing *Ralston Purina Co.*, 346 U.S. at 126); *see also CKB168 Holdings.*, 210 F. Supp. 3d at 451-452; *Ishopnomarkup.com, Inc.*, 2007 WL 2782748, at *3 ("Once the SEC has established a prima facie violation of Section 5, the burden shifts to the defendant to prove an applicable exemption or safe harbor from registration." (citation omitted)).

Defendants do not dispute that they offered or sold OPP Tokens via SAFTs, SEC 56.1 ¶¶ 52-53, or that they did so through interstate commerce. ECF No. 27 (Am. Answer) ¶ 15. Nor could they, given that they used the internet to provide offering materials and market the offering to investors. SEC 56.1 ¶¶ 133-136. Nor do Defendants dispute that Opporty never had a registration statement filed or in effect. Am. Answer ¶ 77. Accordingly, this motion turns on whether Defendants offered or sold "securities" in the form of "investment contracts" under the Securities Act.

---

[3]      Accordingly, Defendants' purported "advice of counsel" defense (*see* Am. Answer, Twenty-Third Affirmative Defense) must fail, as it is well-settled that an advice of counsel defense "provides no protection against a violation of a strict liability statute like Section 5." *Cavanagh II*, 2004 WL 1594818, at *17.

## A.      Defendants Offered And Sold Securities In The Form Of Investment Contracts

An "investment contract" is a species of securities specifically enumerated in Securities Act Section 2(a)(1).  *See* 15 U.S.C. § 77b(a)(1).  Under the "*Howey* test" articulated,  and continuously re-confirmed, by the Supreme Court, an investment contract exists whenever there has been: (1) an investment of money, (2) in a common enterprise, (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.  *Howey*, 328 U.S. at 301; *see also SEC v. Edwards* 540 U.S. 389, 393-95 (2004).  The definition of investment contract is "a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Howey*, 328 U.S. at 299.

The Second Circuit has explained that the *Howey* test involves an analysis of "whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way.'"  *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008) (quoting *SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 583 (2d Cir. 1982)).  In analyzing whether something is a security, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), "and the emphasis should be on the economic realities underlying a transaction," *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975).

"Consistent with *Howey*'s focus on substance over form, [courts] look at all the representations made by the promoter in marketing the interests, not just at the legal agreements underlying the sale of the interest."  *SEC v. Shields*, 744 F.3d 633, 646 (10th Cir. 2014) (quoting *SEC v. Merchant Cap., LLC*, 483 F.3d 747, 756-57 (11th Cir. 2007)).  "[T]he test whether a contract constitutes an investment contract within the Securities Act is 'what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.'"  *Glen-Arden Commodities, Inc. v. Constantino*, 493 F.2d 1027, 1029, 1034 (2d Cir. 1974) (quoting *SEC v. C.M.*

11

*Joiner Leasing Corp.*, 320 U.S. 344, 352-53 (1943)); *see also SEC v. Blockvest, LLC*, No. 18 Civ. 2287, 2019 WL 625163, at *6 (S.D. Cal. Feb. 14, 2019) (same).

In applying these principles under *Howey*, courts have routinely recognized that digital assets constitute investment contracts subject to the federal securities laws. *See SEC v. Kik Interactive*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) (finding digital token to be an "investment contract" and granting summary judgment for SEC); *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 368-78 (S.D.N.Y. 2020) (granting preliminary injunction and holding there was a substantial likelihood of success on the merits that the digital assets there were securities); *Blockvest*, 2019 WL 625163, at *9-11 (granting motion for preliminary injunction); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 357 (S.D.N.Y. 2019) (denying motion to dismiss complaint); *SEC v. NAC Found., LLC*, 512 F. Supp. 3d 988, 995-97 (N.D. Cal. 2021) (denying motion to dismiss complaint); *Beranger v. Harris*, No. 18 Civ. 05054, 2019 WL 5485128, at *4 (N.D. Ga. Apr. 24, 2019) (denying motion to dismiss claim that digital tokens were securities); *Solis v. Latium Network, Inc.*, No. 18 Civ. 10255, 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018) (denying motion to dismiss complaint); *United States v. Zaslavskiy*, No. 17 Cr. 647, 2018 WL 4346339, at *8-9 (E.D.N.Y. Sept. 11, 2018) (denying motion to dismiss indictment).

As set forth herein, the undisputed facts show that the offers and sales of OPP Tokens via SAFTs meet the *Howey* test as a matter of law, and that Defendants engaged in an unregistered public offering in violation of Securities Act Section 5.

### 1.    Opporty Obtained An Investment Of Money

There can be no genuine dispute that all OPP Token purchasers made an "investment of money." Those Pre-Sale investors who executed a SAFT were required to, and did, pay Opporty in Ether, a virtual currency. SEC 56.1 ¶¶ 58, 131. Courts have found that payments of Ether and other virtual currencies have easily satisfied the "investment of money" prong of the *Howey* test. *See SEC v. Shavers*, No. 13 Civ. 416, 2014 WL 12622292, at *5 (E.D. Tex. Aug. 26, 2014); *Beranger*, 2019 WL

5485128, at *2 (collecting cases holding that payments of Bitcoin or Ether satisfied "investment of money" element); *see also Kik Interactive*, 492 F. Supp. 3d at 177-78.   Moreover, Opporty's bounty program participants also "invested" by providing marketing or promotional services of value to Opporty in exchange for OPP Tokens, SEC 56.1 ¶¶ 30, 115.   *See Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564 (10th Cir. 1991) (holding "it is well established that cash is not the only form of contribution or investment that will create an investment contract"; "[it] may take the form of 'goods and services,' . . . or some other 'exchange of value'" (citations omitted)).

## 2. OPP Token Purchasers Invested In A Common Enterprise

Likewise, there is no genuine dispute that all OPP Token purchasers who executed SAFTs invested "in a common enterprise." *Howey*, 328 U.S. at 301.[4]   In the Second Circuit, a common enterprise can be established by showing "horizontal commonality"—that is, the "tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets," such that "the fortunes of each investor depend upon the profitability of the enterprise as a whole." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).   To establish horizontal commonality, it is sufficient to show that "each investor was entitled to receive returns directly proportionate to his or her investment stake," including an "increase in the value of the investment." *SEC v. SG Ltd.*., 265 F.3d 42, 46-47, 51 (1st Cir. 2001) (finding horizontal commonality from pooling investors' assets and investors' sharing in profits and risks); *accord SEC v. Infinity Grp. Co.*, 212 F.3d 180, 188 (3d Cir. 2000). While the pooling of assets is "usually combined with the pro-rata distribution of profits," *Revak*, 18 F.3d at 87, a "formalized profit-sharing mechanism is not required for a finding of horizontal commonality." *Balestra*, 380 F. Supp. 3d at 354.

---

[4]      While the SEC does not require or view a "common enterprise" as a distinct element of an "investment contract," *see In re Barkate*, Release No. 49542, 2004 WL 762434, at *3 n.13 (Apr. 8, 2004), *aff'd sub nom. Barkate v. SEC*, 125 F. App'x 892 (9th Cir. 2005),  the undisputed record nevertheless establishes commonality here.  *See infra* at 13-16.

The undisputed facts of this case establish horizontal commonality, because the fortunes of all OPP Tokens investors were tied together by Opporty's pooling of the funds those investors paid to Opporty. *See* SEC 56.1 ¶¶ 130-132.  Opporty told investors in its offering and marketing materials that it would use invested funds to develop Opporty's platform and take other steps to increase the demand for and value of OPP Tokens.  The PPM stated that "[a] significant portion of the proceeds of the [ICO] will be used by [Opporty] to develop the technology supporting the Opporty Ecosystem, to achieve the Minimum Viable Product" and "to build-out the decentralized network powered by a blockchain and OPP token," SEC6, PPM at -1423, and that "[t]he proceeds from the offering will be immediately available to [Opporty] and [Opporty] will have discretion as to how to apply the proceeds in order to develop the minimum viable network functionality," *id.*

Consistent with these representations, Defendants pooled investor funds and used them to fund Opporty's business, including to develop the platform, SEC 56.1 ¶ 96, and to take steps to have OPP Tokens listed on secondary trading platforms, *id.* ¶¶ 88-89.  A document compiled by Defendants during the SEC's investigation shows that Opporty received and spent investor proceeds of 752 ETH from February 9, 2018 to October 26, 2018.  *Id.* ¶ 134 & n.12.  The economic reality is that Opporty, as it said it would, pooled proceeds from its sales of OPP Tokens in order to develop its platform and thus increase the value of OPP Token purchasers' investments.  This demonstrates horizontal commonality because "[t]he stronger the ecosystem that [Defendants] built, the greater the demand for [the tokens], and thus the greater the value of each purchaser's investment." *Kik Interactive*, 492 F. Supp. 3d at 179; *see also Balestra*, 380 F. Supp. 3d at 354 ("[T]he value of [the digital asset] was dictated by the success of the . . . enterprise as a whole, thereby establishing horizontal commonality.").

Furthermore, horizontal commonality is established because all OPP Tokens are the same, and thus, the value of any one holder's OPP Tokens is proportionate to the number of OPP Tokens held.  *See Howey*, 328 U.S. at 301 (investors' "respective shares in th[e] enterprise" were a "convenient

method of determining [their] allocable shares of the profits"); *SG Ltd.*, 265 F.3d at 51 (finding horizontal commonality where investors received "capital units . . . directly proportional to the size of [their] investment[s]" and "expected profits were a function of the number of 'capital units' held"); *Infinity Grp.*, 212 F. 3d at 188 (finding horizontal commonality where the "return on investment was . . . directly proportional to the amount of that investment); *Zaslaviskiy*, 2018 WL 4346339, at *6 (finding horizontal commonality where "profits would be distributed to investors pro rata—given that investors were promised 'tokens' or 'coins' in exchange for, and proportionate to, their investment interests in the schemes").

Although "[t]he Second Circuit has not yet decided whether strict vertical commonality, which requires that the fortunes of the investor be tied to the fortunes of the promoter, can [separately] satisfy the 'common enterprise' element of the *Howey* test," *Kik Interactive*, 492 F. Supp. 3d at 178, n.5, district courts within the Second Circuit have held that it can, *Zaslaviskiy*, 2018 WL 4346339 at *5, n.7 (collecting cases). Vertical commonality is present here as the fortunes of OPP Token purchasers were tied to Defendants' fortunes. *See Revak*, 18 F.3d at 88. If the price of OPP Tokens rose or fell, it would rise and fall for all OPP Token holders—investors and Opporty alike. For example, Opporty stated in its ICO offering materials that Opporty and Grybniak would have a stake in OPP Tokens— including 30% allocated to Opporty's "Development Team and Founders" for long-term company incentives, which aligned the financial interests of investors and Defendants. SEC 56.1 ¶ 100. Further, Opporty highlighted the "40% Phase 2 Reserve" of OPP Tokens that would be "frozen" and under Opporty's control. *Id.* To a reasonable investor, the fact that Defendants retained such a large stake in OPP Tokens signaled that they would have a significant economic incentive to take steps to increase the value of OPP Tokens for their own benefit as well as that of investors. *See Telegram*, 448 F. Supp. 3d at 370-71 (finding "substantial showing of strict vertical commonality" where offering materials' reference to issuer's 28% token reserve demonstrated how issuer's "financial fortunes would continue

15

to be inextricably linked to the fortunes of the [token] Blockchain and, therefore those of the [token] Purchasers"); *see also NAC Found.*, 512 F. Supp. 3d at 996 (citing fact that "defendants retained a healthy share of [the] tokens for their personal and corporate coffers" in finding strict vertical commonality had been sufficiently pled).

> ### 3.     OPP Token Investors Reasonably Expected Profits Derived From Defendants' Entrepreneurial And Managerial Efforts

Further, OPP Token investors had "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Edwards*, 540 U.S. at 395. Profits "can take the form of 'capital appreciation resulting from the development of the initial investment.'" *Kik Interactive*, 492 F. Supp. 3d at 179 (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975)). Profit distributions by the issuer or promoter are not required. *Edwards*, 540 U.S. at 395; *see also Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039 (10th Cir. 1980) ("That the plaintiffs did not expect to realize any tangible gain until they sold their property does not preclude investment intent."). The "reasonable expectation of profit" prong of the *Howey* test does not require that investors be motivated only by profit. *SEC v. Hui Feng*, 935 F.3d 721, 730-31 (9th Cir. 2019).

*Howey* contemplates that an investor is "led to expect profits *solely* from the efforts of the promoter or third party." 328 U.S. at 298-99. "However, the Second Circuit 'ha[s] held that the word 'solely' should not be construed as a literal limitation; rather, [courts] consider whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way.'" *Kik Interactive*, 492 F. Supp. 3d at 179 (internal citations omitted). To determine whether investors reasonably expected profits, courts analyze the "terms of the offer, the plan of distribution, and the economic inducements held out to the prospect," *Joiner Leasing*, 320 U.S. at 352-53, including promotional materials, *Aqua-Sonic*, 687 F.2d at 583. In the context of digital asset offerings like Opporty's ICO, this analysis requires looking to the promoter's "advertising methods"

and "public statements [that] stressed the limited supply of tokens," *Solis*, 2018 WL 6445543, at *3, as well as statements emphasizing the availability of secondary trading markets, *Balestra*, 380 F. Supp. 3d at 355 n.14 ("Purchasers' ability to resell [coins] on other exchanges also supports the conclusion that the coins are securities."). *See also NAC Found.*, 512 F. Supp. 3d at 997 (courts look to promotional materials in analyzing what investors were led to expect).

OPP Token investors had a reasonable expectation of profit, based on Defendants' (1) public statements describing how OPP Tokens' value would increase through their efforts, including their development of the platform; (2) promises to list OPP Tokens on secondary trading platforms; and (3) structuring of the ICO Pre-Sale to incentivize earlier investment at a time when OPP Tokens had no utility.

*First*, in promoting Opporty's ICO, Defendants promised investors that OPP Tokens' "value will increase as the platform develops." SEC 56.1 ¶ 72. Opporty's White Paper promised that the tokens would be "protected against volatility and devaluation" and that their value would be "supported by the growth of the Opporty community." *Id.* ¶ 70. Defendants told potential investors that token value "is supported by the value Opporty brings to its customers"; that as Opporty expanded its platform's functionality, that value would increase; and that token value would "rise with each step of Opporty's development." SEC 56.1 ¶¶ 73-75.

Investors reasonably expected that the promised increase in value of OPP Tokens would be derived from Defendants' efforts. Grybniak testified that when he and/or Opporty told investors that "Opporty's development" would increase OPP Token value, he understood it would be the result of Defendants' efforts, not investors'. *Id.* ¶¶ 76-78; *see also id.* ¶¶ 90-98 (illustrating Defendants' public statements about their efforts to develop Opporty's platform). By contrast, investors were told they would not have *any* role in developing the platform or *any* "voting, management, or control rights" in Opporty. *Id.* ¶¶ 102-103.

In fact, Defendants' efforts to develop Opporty's platform were *required* to increase the value of OPP Tokens.  OPP Tokens only existed and would only appreciate in value through Defendants' efforts to develop Opporty's platform.  *See Kik Interactive*, 492 F. Supp. 3d at 180 (holding that digital asset transactions satisfied "expectation of profits based on efforts of others" prong of *Howey* because "none of [the token's] consumptive use was available at the time of the distribution" and "[i]t would materialize only if the enterprise advertised . . . turned out to be successful").  Opporty's efforts, and only Opporty's efforts, would increase demand for and value of OPP Tokens.

*Second*, Defendants repeatedly told potential investors that they would generate liquidity for OPP Tokens by listing them on secondary trading platforms, creating the expectation that investors would be able to resell OPP Tokens at a profit, SEC 56.1 ¶¶ 79-86.  *See Balestra*, 380 F. Supp. 3d at 356 n.14 ("Purchasers' ability to resell [coins] on other exchanges also supports the conclusion that the coins are securities."); *see also NAC Found.*, 512 F. Supp. 3d at 997 (similar).  "[R]esale in the secondary market" is "crucial to the investor" for "realizing profits from capital appreciation."  *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240 (2d Cir. 1985).  Defendants fostered the expectation by investors that Opporty would provide liquidity for investors' OPP Tokens on secondary trading platforms.   For example, when asked on social media about the issue, Defendants told investors that they were "talking to" and "planning" to have OPP Tokens listed on various digital asset trading platforms.  SEC 56.1 ¶¶ 85-86.  Indeed, Defendants used investor proceeds to pay for the listing of OPP Tokens on the BTCEXA digital asset trading platform.  *Id.* ¶¶ 87-88.

*Third*, Defendants structured the ICO to encourage purchasers to hold their OPP Tokens as a profitable, long-term investment, not to use them.  For example, Defendants provided a bonus of additional OPP Tokens for investors who agreed to hold them for some period—the longer the holding period, the greater the bonus offered.  *See id.* ¶ 59.  Further, these and other bonuses

Defendants promised in the Pre-Sale, *id.* ¶¶ 40, 59-60, constituted guaranteed, fixed profits to Pre-Sale investors at an *earlier* time when OPP Tokens had no utility, *see id.* ¶¶ 116-121 (detailing lack of OPP Token utility at the time of the Pre-Sale through at least February 2019). Taken together, the Pre-Sale bonuses and lack of token utility would lead a Pre-Sale participant to view his or her purchase of OPP Tokens as an investment for profit. *See* SEC10, Doody Expert Rpt. ¶¶ 32-39.

## B.  Grybniak Had "Substantial" Involvement In The Offering

There is also no genuine dispute that Grybniak played a substantial role in the offering and "engaged in steps necessary to the distribution" of the unregistered investment contracts. *See Chinese Consol. Benevolent Ass'n.*, 120 F.2d at 741. No one played a larger role in Opporty's ICO than Grybniak, who throughout the ICO was Opporty's sole owner, officer, decision maker and supervisor. SEC 56.1 ¶¶ 1, 5, 7. In fact, but for Grybniak, who signed each of the 194 SAFTs, *id.* ¶ 56, Opporty's sales of OPP Tokens could not have occurred. Moreover, no one was more involved in marketing and promoting the ICO and soliciting investors than Grybniak. Indeed, just weeks before the Pre-Sale began, he attended digital asset conferences in the U.S. to promote the ICO, resulting in more investors joining the Pre-Sale whitelist. *Id.* ¶¶ 38-39. In addition, Grybniak regularly Tweeted about the ICO, *id.* ¶¶ 36, 71, 73, and posted about the ICO on Opporty's Telegram channel, *id.* ¶¶ 45, 48, 50, 86, and online forums like Bitcointalk.org, *e.g.*, SEC8, Dep. Ex. 25 at 6. Accordingly, Grybniak should be found liable for this violation of Securities Act Section 5.

For the same reasons, summary judgment is proper on the SEC's Fourth Claim against Grybniak for aiding and abetting Opporty's violation of Section 5, ECF No. 1 at 38-39, under Securities Act Section 15(b). 15 U.S.C. § 77o(b) ("[A]ny person that knowingly or recklessly provides substantial assistance to another person in violation of [Section 5] shall be deemed to be in violation of [Section 5] to the same extent as the person to whom such assistance is provided."); *see also SEC v. Apuzzo*, 689 F.3d 204, 212-14 (2d Cir. 2012) (discussing elements of aiding and abetting liability).

### C.     Defendants Cannot Establish A Valid Exemption From Registration

Having established a *prima facie* case of violations of Section 5, the burden shifts to Defendants to establish a valid exemption from the registration requirement.  Defendants assert under their Fifteenth Affirmative Defense that they "complied with all requirements of Rule 506(c) of Regulation D for accredited investors and all requirements of Regulation S for foreign investors under the Securities Act of 1933, whether or not accredited."  Am. Answer at 17; SEC 56.1 ¶¶ 126-129 (Opporty Form D); 17 C.F.R. §§ 230.506(c) & 230.901-905.  Defendants bear the burden of proving entitlement to the exemptions, *Cavanagh*, 445 F.3d at 111 n.13, and "[r]egistration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public," *id.* at 115.

Defendants cannot meet their burden to show that the exemptions under Rule 506(c) "and/or" Regulation S applied to Opporty's ICO and distribution of OPP Tokens, because (1) Opporty sold OPP Tokens via SAFTs to non-accredited investors in violation of the Rule 506(c) exemption; and (2) Opporty cannot claim the safe harbor from registration under Regulation S because Opporty offered and sold OPP Tokens via SAFTs in non-offshore transactions, and Defendants engaged in prohibited directed selling efforts in the U.S.  Opporty's Pre-Sale cannot be deemed separate offerings under Rule 506(c) and Regulation S; however, even assuming so, the purportedly separate offerings should be integrated into a single, non-exempt offering.

***Defendants did not comply with Rule 506(c) because Opporty sold OPP Tokens to non-accredited investors.***  Rule 506(c)(2) of Regulation D states that for an offering to be exempt under that rule, "[a]ll purchasers of securities" must be "accredited investors."   17 C.F.R. § 230.506(c)(2)(i).[5]  Accredited investors are presumed to be able to demand access to information otherwise required by a securities registration statement.  *See Ralston Purina*, 346 U.S. at 125 ("An

---

[5]     Rule 501(a) defines an "accredited investor" as any person who is within certain categories at the time of the sale of the securities, including a natural person whose individual net worth, or joint net worth with that person's spouse exceeds $1,000,000.  17 C.F.R. § 501(a) & (a)(5).

offering to those who are shown to be able to fend themselves is a transaction 'not involving any public offering.'").  Defendants admit they made no attempt to verify whether the 188 OPP Token purchasers in the Pre-Sale who lived outside the U.S. qualified as accredited investors.  SEC 56.1 ¶ 65. Thus, Opporty's sales to non-accredited investors were not in compliance with Rule 506(c).

**Defendants did not comply with Regulation S because they offered or sold SAFTs in non-offshore transactions and engaged in prohibited directed selling efforts in the U.S.** Pursuant to the Regulation S safe harbor, securities offerings "shall be deemed to include offers and sales that occur within the United States and shall be deemed not to include offers and sales that occur outside the United States."  17 C.F.R. § 230.901.  For purposes of Section 5, an offer or sale of securities occurs outside the U.S. if, among other conditions, (1) the issuer makes the offer or sale in an "offshore transaction," and (2) the issuer makes no "directed selling efforts" in the U.S.  *Id.* § 230.903(a).  A "transaction" is "offshore" where "the offer is not made to a person in the United States."  *Id.* § 230.902(h)(1)(i).  Here, Opporty's ICO Pre-Sale undisputedly involved offers and sales to persons in the U.S.  SEC 56.1 ¶¶ 52, 56-57, 64.

Defendants also undisputedly engaged in "directed selling efforts" in the U.S., "activit[ies] undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for any of the securities being offered in reliance on" Regulation S.  17 C.F.R. § 230.902(c)(1).  Directed selling efforts include "marketing efforts in the United States designed to induce the purchase of securities purportedly being distributed abroad."  *Offshore Offers and Sales*, Securities Act Rel. No. 6863, 1990 WL 311658, at *10 (Apr. 24, 1990).  Defendants engaged in efforts to condition the U.S. market for their ICO and sales of OPP Tokens.  For example, Grybniak promoted the ICO at digital asset conferences in the U.S., SEC 56.1 ¶ 38; Defendants posted all offering materials on Opporty's U.S. website, *id.* ¶ 32; and Pre-Sale participants were required to go to that website to execute the SAFT, *id.* ¶ 61.  *See Statement of the Comm'n Regarding Use of Internet Web*

*Sites to Offer Securities*, SEC Rel. No. 33-7516, 63 Fed. Reg. 14,806, 14,809 (Mar. 27, 1998) (SEC "assumes that the information posted on a Web site would, were we to deem it to occur in the United States, constitute an "'offer' within the meaning of Section 5(c)" and thus a "directed selling effort" prohibited under Regulation S. Also, Defendants solicited investors on their social media pages and paid for sponsored content about the ICO on third-party websites, all of which were accessible in the U.S. SEC 56.1 ¶¶ 34-36. And, Defendants paid digital asset "advisors" located in the U.S. to promote OPP Tokens. *Id.* ¶¶ 41-43. Defendants undertook these activities for the purpose of, or with the reasonably foreseeable effect of, conditioning the market in the U.S. for the SAFTs or OPP Tokens. *See SEC v. Martino*, 255 F. Supp. 2d 268, 286 (S.D.N.Y. 2003) (holding that Regulation S did not apply to purportedly foreign offering where issuer made directed selling efforts in the U.S., including mailings and direct communications).

Moreover, there is no evidence that Defendants took any precautionary measures or procedures to *avoid* targeting potential U.S. investors. *See* SEC Rel. No. 33-7516, 63 Fed. Reg. at 14,810 (SEC stating that U.S. issuers, like Opporty, must take additional precautions designed to ensure that only non-U.S. persons can access the offering, such as using passwords). Indeed, as discussed *infra* at 23-24, the undisputed evidence is that Opporty's offering materials and Defendants' solicitations were the same for, and equally targeted, U.S. and non-U.S. persons.

**Defendants did not conduct separate offerings under Rule 506(c) and Regulation S.** Regulation D provides that offers and sales of securities outside the U.S. that are conducted "*in accordance with*" Regulation S may rely on the Regulation S safe harbor "even if coincident offers and sales are made *in accordance with* Regulation D inside the United States," 17 C.F.R. § 230.500(g) (emphases added). Further, the Commission has stated that "[c]oncurrent offshore offerings that are conducted *in compliance with* Regulation S will not be integrated with domestic unregistered offerings that are conducted *in compliance with* Rule 506 . . . ." SEC Rel. No. 33-9415 § 4 (July 10, 2013) (emphases

added).  Defendants, however, cannot show that their ICO Pre-Sale constituted separate, distinct offers and sales "in accordance with" or "in compliance with" Rule 506(c) of Regulation D on the one hand, and with Regulation S on the other.

As discussed *supra* at 20-22, Defendants' Pre-Sale was not in accordance with or in compliance with *either* Rule 506(c) of Regulation D, or Regulation S.  The Pre-Sale was not in accordance with Rule 506(c) because Defendants sold OPP Tokens via SAFTs to 188 of 194 purchasers for whom Defendants did not verify to be accredited investors.  And, the Pre-Sale was not in accordance with Regulation S because, Defendants offered and sold SAFTs to U.S. investors in non-offshore transactions, and Defendants engaged in directed selling efforts in the U.S. prohibited by Regulation S.  Under these circumstances, Defendants' ICO Pre-Sale cannot be deemed separate "coincident or concurrent" offerings under Rule 506(c) and Regulation S.  *See Cavanagh*, 445 F.3d at 114 (rejecting defendants' formalistic arguments that their offers and sales were exempt from registration by virtue of "multiple transactions" and finding defendants had engaged in a "*single* actual transaction with multiple stages").  *See Cavanagh II*, 2004 WL 1594818, at *24 ("Regulation S, however, 'does not apply to transactions that, though in technical compliance, are designed to evade the registration requirement.") (quoting *Geiger v. SEC*, 363 F.3d 481, 488 (D.C. Cir. 2004)).

Additionally, Defendants undisputedly intended to, and did, offer and sell securities in the Pre-Sale as a single offering.  Defendants told the public that Opporty was conducting one "Initial Coin Offering," *see, e.g.*, SEC7, Opporty White Paper Version 1.3 at -2895, and that pursuant to the SAFT it was offering a "[t]otal number of tokens" at a uniform price of "0.0002 ETH per Token."  SEC27, SAFT at -1319.  Defendants filed a Form D notice of *one* offering of securities via SAFTs that raised $550,000, from both U.S. and non-U.S. investors.  SEC 56.1 ¶¶ 126-129.  Opporty's ICO Pre-Sale occurred at the same time for all investors, in the U.S. and abroad, *id.* ¶¶ 49, 52.  Further, Defendants used the same offering materials for U.S. and non-U.S. investors, *id.* ¶ 33, and the SAFT terms were

identical for all investors, *id.* ¶ 57.  Finally, Defendants directed all investors worldwide to the same

U.S. website to execute the SAFTs.  *Id.* ¶¶ 61-62.

**Even assuming Opporty engaged in two separate offerings, they should be integrated into a single, non-exempt offering.**  Even where an issuer purports to conduct two separate offerings, courts will deem them to constitute one "integrated" offering in violation of Section 5 where certain circumstances apply, because "a person may not separate parts of a series of related transactions, the sum total of which is really one offering."  *SEC v. Mattera*, No. 11 Civ. 8323, 2013 WL 6485949, at *12 (S.D.N.Y. Dec. 9, 2013).  Opporty's supposed "two" offerings were inseparable and thus, are ineligible for Defendants' claimed exemptions.  The question of whether purportedly separate offerings should be integrated depends on the facts and circumstances, and the following five factors are traditionally considered: (i) whether the sales are part of a single plan of financing; (ii) whether the sales involve issuance of the same class of securities; (iii) whether the sales have been made at or about the same time; (iv) whether the same type of consideration is being received; and (v) whether the sales are made for the same general purpose.  *Nonpublic Offering Exemption*, 1933 Act Release No. 33-4552, 27 Fed Reg. 11316, 1962 WL 69540, at *3.[6]  "Not all of these factors need be established to justify a finding that transactions claimed to be separate were in fact one integrated transaction," *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 364 (S.D.N.Y. 1998) *aff'd* 155 F.3d 129 (2d Cir. 1998), though "the first and fifth factors are often given greater weight."  *Mattera*, 2013 WL 6485949, at *13; *Kik Interactive Inc.*, 492 F. Supp. 3d at 181.

---

[6]      Before this lawsuit was filed, these factors were enumerated in a Note to Rule 502(a) of Regulation D.  In November 2020, the SEC adopted a new integration rule, Securities Act Rule 152, 17 C.F.R. § 230.152, to streamline the Securities Act's various integration provisions.  *See Facilitating Capital Formation and Expanding Investment Opportunities by Improving Access to Capital in Private Markets*, Rel. No. 33-10884 (Nov. 2, 2020).  Rule 152 provides that "in determining whether two or more offerings are to be treated as one for the purpose of . . . qualifying for an exemption from registration under the [Securities] Act, offers and sales will not be integrated if, based on the particular facts and circumstances, the issuer can establish . . . that an exemption from registration is available for the particular offering." 17 C.F.R. § 230.152(a).

Here, Opporty's offering to U.S. investors under Rule 506(c) should be integrated with (its supposedly separate) offering to non-U.S. investors under Regulation S.  There is no dispute that Opporty's offers and sales to U.S. and non-U.S. investors were part of a single plan of financing or that the sales were made for the same general purpose—to fund the development of Opporty's platform.  *See Mattera*, 2013 WL 6485949 at *13 ("the first and fifth factors are often given greater weight" in integration analysis).  Further, the offers and sales to U.S. and non-U.S. investors: (1) involved the issuance of the same OPP Tokens, SEC 56.1 ¶ 112; (2) were made at the same time during the Pre-Sale, *id.* ¶¶ 45-46; and (3) were all in exchange for the same consideration, 0.0002 ETH per token, *id.* ¶ 51.  Accordingly, Defendants cannot avoid integration for Opporty's purportedly distinct offers and sales to U.S. and non-U.S. persons, which, even assuming they were in technical compliance with the claimed exemptions, were "part of a plan or scheme to evade the registration requirements of the" Securities Act.  17 C.F.R. § 230.152.

## CONCLUSION

For all of the foregoing reasons, the Court should grant the SEC's motion for partial summary judgment and enter an order finding Defendants liable for violating Section 5, and finding Grybniak liable for aiding and abetting Opporty's direct violation of Section 5.

Dated: November 17, 2021

/s/ *Nicholas C. Margida*
Nicholas C. Margida
Mark Oh
Kendra Kinnaird
U.S. SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549-5977
(202) 551-8504
MargidaN@SEC

*Counsel for Plaintiff*
*U.S. Securities and Exchange Commission*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 17, 2021, I caused a copy of the Plaintiff's Memorandum of Law In Support of its Motion for Partial Summary Judgment to be served, pursuant to the parties' agreement to accept electronic service, on counsel for Defendants, Glenn Manishin, at glenn@paradigmshiftlaw.com.

<u>/s/ Nicholas C. Margida</u>
*Counsel for Plaintiff*
*U.S. Securities and Exchange Commission*