UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| -against- | Civil Action No. 1:20-cv-00327-EK-MMH |
| SERGII "SERGEY" GRYBNIAK and OPPORTY INTERNATIONAL, INC., | |
| Defendants, and | |
| CLEVER SOLUTION, INC. | |
| Relief Defendant. | |

MEMORANDUM IN SUPPORT
OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Glenn B. Manishin (admitted *pro hac vice*)
PARADIGMSHIFT LAW LLP
6735 Breezy Drive, Suite 101
Warrenton, VA 20187-2716
(202) 256-4600
glenn@manishin.com

*Counsel for Defendants*

Dated: January 7, 2022

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT ...................................................................................................................... 6

I.      OPPORTY'S UTILITY BLOCKCHAIN TOKENS ARE NOT "SECURITIES" ........ 6

II.     THE LONGSTANDING AND CONTINUED ABSENCE OF SEC REGULA-
TIONS OR GUIDANCE ON CLASSIFICATION OF CRYPTOCURRENCY
VIOLATES CONSTITUTIONAL DUE PROCESS ................................................... 10

III.    THE COMMISSION'S SECTION 5 CLAIMS ARE PREMISED ON AN
INVALID AND UNSUPPORTED APPLICATION OF ITS OWN REGULATION
D AND REGULATION S EXEMPTIONS FROM REGISTRATION ...................... 12

IV.    THE SPARSE JUDICIAL DECISIONS AND DICTA ON "STRICT LIABILITY"
UNDER SECTION 5 DO NOT CONTROL APPLICATION OF THE STATUTE
TO NEW AND UNSETTLED FINANCIAL ASSETS, SUCH THAT ADVICE OF
COUNSEL CAN AND MUST BE CONSIDERED AS A FACTOR ........................ 17

V.     THE FRAUD (10b-5) ALLEGATIONS ARE FACTUALLY UNSUPPORTED,
INCORRECT, AND FAIL AS A MATTER OF LAW TO ESTABLISH
MISREPRESENTATION, MATERIALITY OR SCIENTER ................................... 19

        A.      Permitting the SEC to Sue Without Proof of Reliance, Causation and
Injury Violates Article III of the Constitution ................................................... 19

        B.      Defendants Are Entitled to Summary Judgment On the Misrepresentation,
Materiality and Scienter Elements of the Securities Fraud Claims .................. 21

CONCLUSION .................................................................................................................. 25

# **TABLE OF AUTHORITIES**

## Cases

*American Legion v. American Humanist Assn.,* 139 S. Ct. 2067 (2019) ................................. 20

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ............................................................. 21

*Arriaga v. Mukasey,* 521 F.3d 219 (2d Cir. 2008) ................................................................... 10

*Berko v. SEC,* 316 F.2d 137 (2d Cir. 1963) .............................................................................. 20

*Copeland v. Vance,* 893 F.3d 101 (2d Cir. 2018) ..................................................................... 12

*Europe & Overseas Traders v. Banque Paribas London*, 147 F.3d 118 (2d Cir. 1998) .......... 15

*Howard v. SEC,* 376 F.3d 1136 (D.C. Cir. 2004) ..................................................................... 19

*Markowski v. SEC,* 34 F.3d 99 (2d Cir. 1994) ......................................................................... 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) .............................. 21

*Rubin v. Garvin,* 544 F.3d 461 (2d Cir. 2008) ......................................................................... 10

*SEC v. AIC, Inc.,* No. 11-CV-176-TAV-HBG, 2013 WL 5134411 (E.D. Tenn. Aug. 1,
2013), https://bit.ly/3HoJxiH ................................................................................................... 19

*SEC v. Cavanagh,* No. 98-Civ-1818-DLC, 2004 WL 1594818 (S.D.N.Y.
July 16, 2004), *aff'd on other grounds,* 445 F.3d 105 (2d Cir. 2006) ..................................... 19

*SEC v. Credit Bancorp, Ltd.,* 195 F. Supp. 2d 475 (S.D.N.Y 2002) ....................................... 23

*SEC v. Enters. Solutions, Inc.,* 142 F. Supp. 2d 561 (S.D.N.Y. 2001) .................................... 19

*SEC v. Harwyn Industries,* 326 F. Supp. 943 (S.D.N.Y. 1971) ............................................... 18

*SEC v. Jankovic,* No. 15-Civ-1248 (KPF), 2017 WL 1067788 (S.D.N.Y. Mar. 21, 2017) ...... 19

*SEC v. Kik Interactive, Inc.,* 492 F. Supp. 3d 169 (S.D.N.Y. 2020) ................................... 9, 12

*SEC v. Prince,* 942 F. Supp. 2d 108 (D.D.C. 2013) ................................................................. 18

*SEC v. Rana Research, Inc*., 8 F.3d 1358 (9th Cir. 1993) ........................................................ 20

*SEC v. Research Automation Corp.,* 585 F.2d 31 (2d Cir. 1978) ............................................. 21

*SEC v. Savoy Industries, Inc.,* 665 F.2d 1310 (D.C. Cir. 1981) ................................................. 18

*SEC v. Steadman,* 967 F.2d 636 (D.C. Cir.1992) ...................................................... 22

*SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946) ............................................... 5, 7-8, 12

*Spokeo, Inc. v. Robins,* 578 U.S. 330 (2016) ........................................ 20

*TransUnion LLC v. Ramirez,* 141 S. Ct. 2190 (2021) .................................... 5, 19-20

*United States v. DeFries,* 129 F.3d 1293 (D.C. Cir. 1997) ................................. 18

*United States v. Leonard,* 529 F.3d 83 (2d Cir. 2008) ................................... 5, 6

*United States v. Litvak,* 808 F.3d 160 (2d Cir. 2015) ................................... 5

*Wals v. Fox Hills Dev. Corp.,* 24 F.3d 1016 (7th Cir. 1994)...................................... 9

**Statutes**

Securities Act of 1933, § 5, 15 U.S.C. § 77e ....................................................... 1

Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b) ................................................... 2

17 U.S.C. § 77b(a)(1) ............................................................ 5

**Regulations**

Regulation D, 17 C.F.R. § 230.500 *et seq.* ...........................................................*passim*

Regulation S, 17 C.F.R. § 230.901 *et seq.*........................................................... *passim*

Rule 10b-5, 17 C.F.R. § 240.10b-5 ........................................................... 2

17 C.F.R. § 230.147 ........................................................... 16

17 C.F.R. § 230.148(a) ........................................................... 15

17 C.F.R. § 230.152 ........................................................... 14

17 C.F.R. § 230.902(c) ........................................................... 14

17 C.F.R. § 230.902(c)(3)(i)........................................................... 15

17 C.F.R. § 230.902(h)(1)(i) ........................................................... 14

**Administrative Materials**

*Exemptions to Facilitate Intrastate and Regional Securities Offerings,* RIN 3235-AL80, Release Nos. 33-10238; 34-79161; File No. S7-22-15 (Oct. 26, 2016) ................................... 14

Hester M. Peirce, *How We Howey*, May 9, 2019, https://www.sec.gov/news/speech/peirce-how-we-howey-050919 ................................................................................................ 11

*In the Matter of Coinschedule,* Statement of Commissioners Peirce and Roisman, July 14, 2021, https://www.sec.gov/news/public-statement/peirce-roisman-coinschedule ............. 11

*In re Munchee, Inc.,* Order Instituting Cease-And-Desist Proceedings, SEC File No. 3-18304 (Dec. 11, 2017) ............................................................................................................. 1

Jay Clayton, *Statement on Cryptocurrencies and Initial Coin Offerings,* Dec. 11, 2017, https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 ...................... 8, 13

*Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO,* Release No. 81207 (July 25, 2017) .................................................. 3, 4, 10-11

Press Release, "SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities," July 25, 2017, https://www.sec.gov/news/press-release/2017-131 ............... 4

SEC, *Facilitating Capital Formation and Expanding Investment Opportunities by Improving Access to Capital in Private Markets,* Final Rule, RIN 3235-AM2786 Fed. Reg. 3496 (2021) ...................................................................................................................... 16

SEC, *Framework for "Investment Contract" Analysis of Digital Assets,* https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets ............ 11

Spotlight on Initial Coin Offerings (ICOs), https://www.sec.gov/ICO ..................................... 4

**Other**

Blockchain Council, *Security Tokens Vs. Utility Tokens: A Concise Guide,* https://www.blockchain-council.org/blockchain/security-tokens-vs-utility-tokens-a-concise-guide/ ................................................................................................................................ 8

Bitpanda, *What is the difference between Utility Tokens and Security Tokens?,* https://www.bitpanda.com/academy/en/lessons/what-is-the-difference-between-utility-tokens-and-security-tokens/ ................................................................................................ 8

Emurgo, *Blockchain Primer: What is a Utility Token? How is it different from a Security Token,* May 30, 2019, https://emurgo.io/ja/blog/blockchain-primer-utility-token-security-token ....................................................................................................................... 9

Lin William Cong, *et al., Tokenomics: Cryptocurrency valuation and the roles of tokens,*
Oct. 5, 2018, https://voxeu.org/article/cryptocurrency-valuation-and-roles-tokens ................... 8

Michael Mendelson, *From Initial Coin Offerings to Security Tokens: A U.S. Federal
Securities Law Analysis,* 22 Stan. Tech. L. Rev. 52 (2019) ............................................... 2, 9, 10

R. Layton, *It's Time To End The SEC's 'Clarity' Charade On Crypto,* Forbes,
Sept. 12, 2021, https://www.forbes.com/sites/roslynlayton/2021/09/12/its-time-to-end-
the-secs-clarity-charade-on-crypto/ ......................................................................................... 11

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**U.S. SECURITIES AND EXCHANGE**
**COMMISSION,**

**Plaintiff,**

-against-

**SERGII "SERGEY" GRYBNIAK and**
**OPPORTY INTERNATIONAL, INC.,**

**Defendants, and**

**CLEVER SOLUTION, INC.**

**Relief Defendant.**

Civil Action No. 1:20-cv-00327-EK-MMH

---

**MEMORANDUM IN SUPPORT**
**OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN**
**OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and this Court's October 18, 2021 minute order, Defendants Sergii "Sergey" Grybniak, Opporty International, Inc. ("Opporty") and Clever Solution, Inc. ("Clever Solution"), by their attorney, respectfully submit this Memorandum (a) in support of their for motion summary judgment on all of the claims asserted in this civil case, and (b) in opposition to the motion by Plaintiff Securities and Exchange Commission ("SEC" or the "Commission") for partial summary judgment.

INTRODUCTION

Plaintiff alleges that Opporty and Grybniak jointly and severally violated Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, by offering and selling unregistered "securities" through an initial coin offering ("ICO") of cryptocurrency digital tokens in early 2018. The Complaint

further contends that Defendants violated the antifraud provisions of the federal securities laws, specifically Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R.§ 240.10b-5, by making what Plaintiff alleges were materially false and misleading statements in connection with the ICO.

This case does not, however, involve defendants who ignored or sought to evade applicable securities laws and SEC regulations with respect to their ICO offering. To the contrary, the undisputed facts make clear beyond question that the applicability of federal securities law to cryptocurrency and similar digital "blockchain" assets represents a novel and unsettled issue for which the SEC has refused to promulgate regulations, instead taking the untoward approach of regulation by enforcement. In this case, Opporty and Grybniak themselves learned in late 2017 of the SEC's preliminary conclusion its *Munchee* administrative consent order[1] that *some* cryptocurrency digital assets *might* be classified as securities. Opporty and Grybniak then acted promptly — as one would hope all parties possibly subject to registration or Regulation D (accredited investors) and Regulation S (foreign offering) registration exemptions would do — to engage sophisticated New York City securities counsel, who structured an initial coin offering of currency tokens utilizable *only* for digital transactions on the company's developing services biding platform.

The result was a total refund to initial investors who had purchased tokens before the preparation of formal offering materials (namely a Private Placement Memorandum ("PPM")[2] and Simple Agreement for Future Tokens (the "SAFTs))[3] under SEC Regulations D and S and, based on advice of counsel, a subsequent ICO "presale" offering — which netted less than

---

[1] *In re Munchee, Inc.,* Order Instituting Cease-And-Desist Proceedings, File No. 3-18304 (Dec. 11, 2017); Declaration of Sergii "Sergey" Grybniak, January 7, 2022, ¶ 7 ("Grybniak Decl.").

[2] The PPM is Exhibit 1 to the Grybniak Declaration.

[3] The SAFT, identical for all purchasers, is Exhibit 2 to the Grybniak Declaration.

$550,000, all spent precisely as disclosed to investors — compliant with SEC rules and not in any way materially misleading.

> It is not clear, however, the extent to which a digital token is a security under the investment contract test set forth in *Securities and Exchange Commission v. W.J. Howey Co.,* the seminal case heard before the Supreme Court in 1946 that has been legal doctrine for over seventy years, and the basis for the SEC's recent determination in the *DAO Report.* It is not obvious that cryptocurrencies and digital tokens fit neatly into a single category of regulation…. Arguably, cryptocurrencies are a new class of assets altogether that defy easy categorization into the existing legal framework.

Michael Mendelson, *From Initial Coin Offerings to Security Tokens: A U.S. Federal Securities Law Analysis,* 22 Stan. Tech. L. Rev. 52, 54-55 (2019), citing SEC, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO,* Release No. 81207 (July 25, 2017) ("*DAO Report*").

That quotation is from a law review analysis of the Commission's evolving, fact-specific and highly ambiguous approach to legal classification of blockchain tokens. But it is also exactly what Opporty emphasized to investors in its own offering materials.

> Because of the differences between the SAFT or OPP Tokens and traditional investment securities, *there is a risk that issues that might easily be resolved by existing law if traditional securities were involved may not be easily resolved for the SAFT or OPP Token.* There is little precedent on how existing law might treat the rights and obligations between and among the Company and Investors in the SAFT or purchasers of OPP Tokens.

Opporty PPM at 29 (emphasis supplied). That uncertainty has sadly been created and exacerbated by the Commission itself, which takes the position that *based on specific facts, some* ICOs *may* be securities offerings so as to fall under the SEC's jurisdiction. Yet the Commission has not proposed or promulgated rules or issued any precedential agency decision, cautioning merely that "U.S. Securities Laws May Apply to Offers, Sales, and Trading of Interests in Virtual Or-

ganizations"[4] and that "ICOs, based on specific facts, may be securities offerings, and fall under the SEC's jurisdiction of enforcing federal securities laws."[5]

The significance of this extended and continuing ambiguity is simple. The Commission should not be permitted by the courts to take advantage of its self-created uncertainty over the legal status of blockchain ICOs by using this matter as a test case for judicial adoption of a non-statutory legal doctrine treating *some* blockchain utility tokens as securities for purposes of registration or anti-fraud regulation under the Act and applying unprecedented interpretations of its exemption regulations (Regs. D and S), which address neither blockchain assets nor the new, very different environment of Internet-available offering materials.[6]

There is no evidentiary support for a claim that the Opporty did not accurately disclose all material market, financial, company and regulatory risks. In fact, Opporty went far beyond its legal obligations, specifically highlighting that:

> After reviewing the *[2017 DAO] Report,* we believe that OPP Tokens and the Company's efforts in marketing the OPP Tokens are substantially different from DAO Tokens and Munchee Tokens. Nevertheless, as noted by the Commission, the issuance of tokens represents a new paradigm and the application of the federal securities laws to this new paradigm is very fact specific. If OPP Tokens were deemed to be a security under U.S. federal securities laws, then, prior to the issuance of OPP Tokens pursuant to the SAFT, we may be required to register to such issuance under the Securities Act.

PPM at 28-29. And unlike other SEC enforcement cases, here there are no allegations of *any* substantial, let alone repeated, claims of value appreciation for the tokens sold by Opporty — which is manifestly the key legal criterion under *Howey* for treating an "investment contract"

---

[4] Press Release, "SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities," July 25, 2017, https://www.sec.gov/news/press-release/2017-131.
[5] Spotlight on Initial Coin Offerings (ICOs), https://www.sec.gov/ICO.
[6] *See* Sections III and IV *infra.*

as a security.[7] Indeed, price volatility or appreciation of digital currency used, as here, solely for online commercial transactions would fundamentally contradict the function of such utility currency — for which any significant price change is fatal to the marketplace business model **and** its commercial users, since either the seller or buyer would necessarily be directly and adversely affected financially by a change in value. Grybniak Decl. ¶ 19.

If the Commission had evidence that Opporty offered or promised OPP Token purchasers an opportunity to profit from Opporty's platform development efforts, as part of a "common enterprise," the Commission would have simply outlined all the relevant facts and let those facts speak for themselves. Instead, the Complaint here reflects a consistent effort to twist the facts by removing quotes from their context and misrepresenting the documents and testimony that the Commission gathered in its investigation.

Nor are the allegations of Opporty' purported social media misrepresentations true as a factual matter or material as a legal matter. Each of the claimed misstatements is in fact accurate and not misleading. Grybniak Decl. ¶¶ 24-32. Plaintiff has produced in discovery no factual evidence from any of the near 200 investors in the ICO that any investor, U.S. or foreign, regarded the alleged misrepresentations as "material" to their cryptocurrency investment, that any investor in fact relied on such statements, or that any investor was injured as a proximate result. The SEC's position that it may prevail without proof of reliance, causation and injury violates Article III of the Constitution. *TransUnion LLC v. Ramirez,* 141 S. Ct. 2190 (2021); *see* Section V *infra.* Indeed, Plaintiff relies principally on an expert witness whose proffered opinion testi-

---

[7] *SEC v. W.J. Howey Co.,* 328 U.S. 293, 299 (1946). The third prong of the *Howey* test is whether investors have been "*led to expect* profits solely from the efforts of the promoter." *United States v. Leonard,* 529 F.3d 83, 88 (2d Cir. 2008) (emphasis supplied), quoting *Howey,* 328 U.S. at 299. Nothing in the PPM and SAFT offering materials, or the social media comments alleged in the Complaint, can fairly be characterized as Opporty or Grybniak "leading" investors to "expect profits" from OPP Tokens, as opposed to their own commercial transactions as sellers or buyers on Opporty's decentralized, blockchain-powered commercial marketplace.

mony would state that a "reasonable investor" would likely regard such statements as material. That is not dispositive as a matter of law (*United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015)), and no case of which counsel is aware has sustained 10b-5 liability on the basis of expert testimony.

Even if constitutional as a standing matter, the fraud and 10b-5 allegations asserted by the Commission in this case, simply put, are factually unsupported, incorrect, and fail as a matter of law to establish the required elements of misrepresentation, materiality or scienter. When viewed fairly, and in context, the evidence in this case paints a dramatically different picture of the facts and circumstances surrounding Opporty's ICO sale of OPP Tokens in 2018, which make clear that Opporty and Grybniak did not violate — and certainly did not intentionally violate — the anti-fraud provisions of the federal securities laws. Defendants are accordingly entitled to entry of summary judgment in their favor on the fraud claims as well.

## ARGUMENT

## I.   OPPORTY'S UTILITY BLOCKCHAIN TOKENS ARE NOT "SECURITIES"

Cryptocurrency is a new type of purely electronic digital asset, first introduced in 2009 based on decentralized blockchain technology, with numerous and varied applications. Some such cryptocurrencies, like the most well-known examples of Bitcoin and Ether, are offered as speculative investments which can be traded for arbitrage on electronic exchanges like traditional, "hard" currencies. Others, such the OPP Tokens developed by Opporty and challenged in this case, are referred to as "utility" tokens and are used for transactions of goods and services utilizing the Opporty blockchain protocol between willing sellers and buyers.

The fundamental premise of the SEC's Complaint is that by offering and selling OPP Tokens, Defendants sold "securities." Compl. ¶¶ 4-5. But unlike stocks, bonds, options and other

debt and equity corporate instruments, there is no statutory or regulatory provision defining any form of cryptocurrency, digital asset or blockchain token as a security. The only ground on which to rope the Opporty ICO into the realm of federal securities regulation is the slim reed of "investment contracts" under the generic definition at 17 U.S.C. § 77b(a)(1) and the Supreme Court's 75-year old decision in *SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946).

There is no evidence in this case that the OPP Tokens (or their underlying SAFT agreements) meet the *Howey* standard, under which an investment contact is a security where it involves "a transaction or scheme whereby a person invests his money in a common enterprise *and is led to expect profits*" by the issuer. *Howey,* 328 U.S. at 299 (emphasis supplied).[8] The Opporty PPM makes this evidently clear:

> NO MARKET EXISTS FOR THE SAFTS OR THE [OPP TOKEN] RIGHTS CON-
> TAINED THEREIN, AND NONE IS LIKELY TO DEVELOP IN THE REASONABLY
> FORESEEABLE FUTURE.
>
> [OPP Tokens are] a custom virtual token developed by Opporty and unique to the
> Opporty Ecosystem. OPP Tokens can be purchased by users or earned by partici-
> pating in activities that help to grow the Opporty Ecosystem. The Tokens can then
> be spent on Opporty platform services or to pay service providers.
>
> ***There is no existing trading market for the OPP Tokens and such market may not***
> ***develop.***
>
> The OPP Tokens are a new issue of digital tokens for which there is no established
> public market. There can be no assurance that a secondary market will develop or, if a
> secondary market does develop, that it will provide the holders with liquidity of in-
> vestment or that it will continue for the life of the OPP Tokens.
>
> The digital token market is a new and rapidly developing market which may be sub-
> ject to substantial and unpredictable disruptions that cause significant volatility in the
> prices of digital tokens. There is no assurance that the market, if any, for the OPP To-
> kens will be free from such disruptions. *Therefore, there is no assurance that Inves-*

---

[8] The linchpin of that *Howey* test — misstated by the SEC — is whether investors have been "led to expect profits solely from the efforts of the promoter." *United States v. Leonard,* 529 F.3d at 88, quoting *Howey,* 328 U.S. 293 at 299. *See* SEC Memorandum of Law ("SEC Mem.") at 1, 11, 16-18.

*tors in the SAFTs or OPP Tokens will be able to sell OPP Tokens at a particular time or that the price received upon sale will be favorable.*

PPM at 1, 24-26 (emphasis supplied).

According to former SEC Chairman Clayton, "[t]okens and offerings that incorporate features and *marketing efforts that emphasize the potential for profits based on the entrepreneurial or managerial efforts of others* continue to contain the hallmarks of a security under U.S. law."[9] But here, neither the facts alleged in the Complaint nor the evidence cited in the SEC's present motion papers demonstrate any statement, representation or action by either Opporty or Grybniak with which OPP Token investors were "led to expect profits" from the development of Opporty's blockchain e-ecommerce platform. Nothing Opporty did or said, in in its offering materials or otherwise, promised or projected an increase in value of the OPP Tokens. Grybniak Decl. ¶ 18.

Under *Howey*, the key element is whether the issuer led investors to believe they would realize appreciation gains. That did not happen here, and would be totally in contradiction to the purpose of digital utility currency in the context of electronic commercial transactions. That is because *any* price volatility is fatal economically to marketplace users since either the seller or buyer would necessarily be adversely affected financially. *Id.* ¶ 19.[10] "Unlike a security token, utility tokens are not bought with the intention of return on investment. They are simply bought

---

[9] Jay Clayton, Statement on Cryptocurrencies and Initial Coin Offerings, Dec. 11, 2017, https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.

[10] *See, e.g.,* Bitpanda, *What is the difference between Utility Tokens and Security Tokens?,* https://www.bit-panda.com/academy/en/lessons/what-is-the-difference-between-utility-tokens-and-security-tokens/ (Utility token value "does not relate to [the] current state of the valuation of a company."); Blockchain Council, *Security Tokens Vs. Utility Tokens : A Concise Guide,* https://www.blockchain-council.org/blockchain/security-tokens-vs-utility-tokens-a-concise-guide/ (Utility tokens are "a form of a digital coupon that can be redeemed in the future for discounted fees or special access to a product or service. Unlike security tokens, utility tokens are not used as investments."); Lin William Cong, et al., *Tokenomics: Cryptocurrency valuation and the roles of tokens,* Oct. 5, 2018, https://voxeu.org/article/cryptocurrency-valuation-and-roles-tokens ("Utility tokens do not derive their value from projects' underlying cash flows but from their collective usage on blockchain platforms.").

to be used rather than seeing an appreciation of value. Utility tokens have functionality baked into their core."[11] And rather than promising or implying profits or value appreciation of its utility tokens, in a Telegram social media post (not addressed by the Commission) Opporty made clear, in broken English, that "We don't prediction Opporty token value in the future nor giving promises increasing price." Grybniak Decl. ¶ 20.

"Investment contract" was included in the definition of "security" for the "limited purpose of identifying nonconventional instruments that have the essential properties of a debt or equity security." *Wals v. Fox Hills Dev. Corp.,* 24 F.3d 1016, 1018 (7th Cir. 1994). Those are demonstrably not the circumstances here. Nor can the SEC credibly allege or establish factually there was a "pooling of investors' contributions and distribution of profits and losses on a pro-rata basis among investors." *SEC v. Infinity Group Co.,* 212 F.3d 180, 187-88 (3d Cir. 2000). That the funds invested would admittedly be used to build out the Opporty system says nothing about whether "the fortunes of each investor depend upon the profitability of the enterprise as a whole," SEC Mem. at 13, because nothing about the profitability of Opporty had any financial effect upon the price of its transactional tokens, which are not independently of value. The *SEC v. Kik Interactive, Inc.* decision on which the Commission relies is not germane because there, the district court found that "[r]ather than receiving a pro-rata distribution of profits, investors reaped their profits in the form of the increased value" of the company. 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020); SEC Mem. at 12, 14.[12] The value of Opporty as a company is irrelevant in this case.

---

[11] Emurgo, *Blockchain Primer: What is a Utility Token? How is it different from a Security Token,* May 30, 2019, https://emurgo.io/ja/blog/blockchain-primer-utility-token-security-token.

[12] "Kik was offering only a limited supply of Kin, so as demand increased, the value of Kin would increase, and early purchasers would have the opportunity to earn a profit." *Kik,* 492 F. Supp. 3d at 179.

The undisputed evidentiary record thus establishes no material question of fact that Defendants did not — and most importantly, had no rational business reason to — promise or lead investors to believe that OPP Tokens would appreciate or that Opporty's transactional platform would increase the demand for and value of OPP Tokens. Grybniak Decl. ¶¶ 18-19. Regardless of any other issue, this failure of proof on the predicate question of whether Opporty in fact offered "securities" in its ICO demands entry of summary judgment for Defendants.

## II.  THE LONGSTANDING AND CONTINUED ABSENCE OF SEC REGULATIONS OR GUIDANCE ON CLASSIFICATION OF CRYPTOCURRENCY VIOLATES CONSTITUTIONAL DUE PROCESS

Neither the *DAO Report, supra* at 3, nor any other Commission action, decision or admirative guidance provided Opporty with "sufficiently definite warnings as to the proscribed conduct when measured by common understanding and practices." *Rubin v. Garvin,* 544 F.3d 461, 467 (2d Cir. 2008), *quoting Arriaga v. Mukasey,* 521 F.3d 219, 224 (2d Cir. 2008).

The Plaintiff in this case has had well more than a decade to grapple with the revolutionary implications of cryptocurrency and to develop regulations, or concrete enforcement guidance, such as safe harbors, governing application of the federal securities laws to ICOs and blockchain-based digital assets. It has chosen consciously not to do so, but instead to temporize. "[T]he law of ICOs and digital token financing is by no means final or clear, and with little official guidance to go on, startups are left to fend for themselves in a sea of self-declared experts." Mendelson, *supra*, 22 Stan. Tech. L. Rev. at 54. As a result, the industry has been forced to hunt for regulatory clues among the SEC's conflicting statements, Commissioner and staff speeches, no-action letters, closed-door meetings with the SEC and nonprecedential settlements.

The SEC stresses that, in its view, application of the *Howey* test to the offer or sale of cryptocurrency depends on the specific "facts and circumstances" of each individual transaction.

10

*DAO Report* at 17-18. This means that a finding of an investment contract based on one set of facts and circumstances provides absolutely no "sufficiently definite" legal warning about how the test applies to different facts. And while Commission released a "framework" of some 38 factors purporting to assess when the sale of a token may constitute an investment contract,[13] by its own admission those factors "are not intended to be exhaustive in evaluating whether a digital asset is an investment contract or any other type of security, and no single factor is determinative." More disconcerting, the SEC caveats that its framework "is not a rule, regulation or statement of the Commission, and [that] the Commission has neither approved nor disapproved its content." *Id.*

No reasonable business person involved with cryptocurrency would be able to balance 38 factors and have any clarity on whether his or her conduct is subject to, let alone potentially would violate, what the SEC in this case perversely alleges are "strict liability" securities laws. In fact, Commissioner Pierce agrees:

> I worry that non-lawyers and lawyers not steeped in securities law and its attendant lore will not know what to make of the guidance. Pages worth of factors, many of which seemingly apply to all decentralized networks, might contribute to the feeling that navigating the securities laws in this area is perilous business.

Hester M. Peirce, *How We Howey*, May 9, 2019, https://www.sec.gov/news/speech/peirce-how-we-howey-050919. Commissioner Pierce is right, as scholars, journalists and the cryptocurrency and blockchain industry generally continue to express frustration and confusion as to whether the securities laws apply to cryptocurrency transactions, and if so, which ones.[14]

---

[13] SEC, *Framework for "Investment Contract" Analysis of Digital Assets,* https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

[14] *See In the Matter of Coinschedule,* Statement of Commissioners Peirce and Roisman, July 14, 2021 (criticizing a recent Commission crypto settlement as "symptomatic of [the SEC's] reluctance to provide additional guidance about how to determine whether a token is being sold as part of a securities offering for which tokens are securities"), https://www.sec.gov/news/public-statement/peirce-roisman-coinschedule; R. Layton, *It's Time To End The SEC's 'Clarity' Charade On Crypto,* Forbes, Sept. 12, 2021, https://www.forbes.com/sites/roslynlayton/2021/09/12/its-time-to-end-the-secs-clarity-charade-on-crypto/.

11

Accordingly, it is incumbent on this Court to determine as a legal matter whether the generic securities laws enacted nearly a century ago — and particularly the two-word "investment contract" phrase from their codified definitions — may fairly be applied as a matter of due process to this new and disruptive digital financial medium so as to provide notice to Defendants of what conduct is proscribed legally. The vagueness bar of the Due Process clause is violated where a law "authorizes or even encourages arbitrary and discriminatory enforcement." *Copeland v. Vance,* 893 F.3d 101, 114 (2d Cir. 2018). There are no controlling Second Circuit decisions on this issue as applied to cryptocurrency. Yet since there have been scores of other digital token ICOs that the SEC settled or declined to challenge — including many orders of magnitude larger monetarily than the Opporty's modest private placement transaction — the agency's choice to prosecute Opporty and Grybniak is facially suspect as a constitutional matter.

The Commission's legal analysis of the issues in this case admittedly required the assistance of more than 35 internal agency lawyers and experts. Grybniak Decl. ¶ 11 and Exh. 8 (SEC privilege log). This corroborates the evident risk that the SEC has chosen to pursue the instant litigation despite potentially serious internal divisions on application of the *Howey* test and the parallel Regulation D/S issues addressed in Sections III and IV of this Memorandum. While Judge Hellerstein of the Southern District in *Kik* declined to hold the "investment contract" standard void for lack of notice, 492 F. Supp. 3d at 183, Defendants urge the Court to disregard that non-precedential decision and make its own, independent assessment of the constitutionality of the *Howey* standard as applied to the new, rapidly changing and disruptive financial environment of cryptocurrency.

### III. THE COMMISSION'S SECTION 5 CLAIMS ARE PREMISED ON AN INVALID AND UNSUPPORTED APPLICATION OF ITS OWN REGULATION D AND REGULATION S EXEMPTIONS FROM REGISTRATION

Even if the Commission could establish that OPP Tokens are "securities," the facts do not support a judicial determination that Opporty — or more properly, its securities counsel, as discussed further below and in Section IV of this Memorandum — unlawfully claimed exemptions from registration for the ICO.

Pursuant to Rule 506 and Regulation D, the sale of a security to an "accredited investor" is exempt from registration, subject to conditions. These conditions include taking "reasonable" steps to verify the status of accredited investors and filing Form D with the Commission. It is of course self-evident, as former SEC Chairman Clayton announced well before this case, that "[i]t is possible to conduct an ICO without triggering the SEC's registration requirements." Jay Clayton, *Statement on Cryptocurrencies and Initial Coin Offerings*, *supra.*

There is no question of fact that Opporty complied with the requirements of Reg. D and Rule 506. Although the Commission now disputes the exemption, it has not identified a single requirement of Rule 506 which Opporty violated. Opporty conducted diligence on each of the United States ICO presale participants to verify that they were "accredited," included language in the PPM and SAFTs required by Rule 506, and timely filed a Form D with the Commission to formalize the registration exemption. Grybniak Decl. ¶ 12. Plaintiff's assertion that Opporty was legally mandated to verify the accredited status of non-U.S. investors is invalid because no such obligation applies to foreign purchasers under Regulation S. Accordingly, because there is no material question of fact whether the Opporty ICO improperly sold OPP Tokens or SAFTs to unaccredited investors in the United States (it did not), Defendants are entitled to summary judgment on that aspect of the SEC's claim of offering unregistered securities.

Nor is there a legitimate basis to assert that token or SAFT sales to non-U.S. investors were prohibited by Regulation S. The SEC appears to believe that because Opporty's website was hosted in the United States, the foreign investor transactions did not take place "offshore" for purposes of Reg. S (SEC Mem. at 21-22; SEC Rule 56.1 Statement ¶ 135). That position is simply unstainable in the global environment of the Internet, since there was and is no physical location for *any* of Opporty's ICO presales or even for the OPP Tokens themselves. These are totally digital assets and transactions taking place entirely in cyberspace and not any specific country. A "transaction" is "offshore" where, as here, "the offer is not made to a person in the United States." 17 C.F.R. § 230.902(h)(1)(i). As the Commission has explicitly recognized, the Internet is "not targeted to the residents of a particular [country]."[15]

Further, the SEC's theory that because a single website, PPM and SAFT were used for both Reg. D and Reg. S exempt transactions, Opporty forfeited the latter, is invalid. SEC Mem. at 23-24; SEC Rule 56.1 Statement ¶ 62. There is no prohibition on a combined offering that relies on both registration exemptions. Indeed, the two exemptions can permissibly be applied "concurrently" under the SEC's long-extant regulations. 17 C.F.R. § 230.152. Opporty maintained the individual nature of each offering by creating separate web portals and investor review protocols, separately for United States investors under Reg. D and offshore foreign investors under Reg. S. Therefore, offering digital tokens to United States investors who had been verified as "accredited" was a valid application of Reg. D because it is uncontested that only six out of 194 purchasers in the ICO were in fact U.S. investors. The Reg. S exemption, conversely, does not require accreditation.

---

[15] *Exemptions to Facilitate Intrastate and Regional Securities Offerings,* RIN 3235-AL80, Release Nos. 33-10238; 34-79161; File No. S7-22-15, at 17 (Oct. 26, 2016).

As to Reg. S, the SEC's apparent position that publishing a website and merely discussing a future securities offering in public — absent advertisements, email campaigns, sales solicitations or the like — constitute "directed selling efforts" violative of 17 C.F.R. § 230.902(c) is misplaced.[16] SEC Mem. at 21-22. Those are not the targeted sales activities, "such as mailings or seminars in the United States designed to induce the purchase of securities purportedly being distributed abroad," preluded by the regulation. *E.g., Europe & Overseas Traders v. Banque Paribas Lond*on, 147 F.3d 118, 124 (2d Cir. 1998). Isolated, limited contact within the United States, as here disseminating routine information normally distributed by a company, does not constitute directed selling as a matter of law; and the regulation in any event expressly exempts "[c]ontact with persons excluded from the definition of 'U.S. person'" from the directed selling bar. 17 CFR § 230.902(c)(3)(i).[17]

The SEC's definition of permissible "concurrent" registration exemptions, written in the early 1990s, does not support Plaintiff's position that despite verifying the non-U.S. status of foreign investors for purposes of Regulation S, Opporty was somehow required to assure that those foreign investors also qualified as "accredited." Other than confirming that issuers are legally permitted to conduct simultaneous offerings under Rule 506 (to U.S. investors) and Regulation S (to non-U.S. persons) so long as each offering complies with its applicable rules, the Commis-

---

[16] Regulation D permits "general solicitation" in the United States. As Opporty's securities counsel testified, that represents an "inherent conflict between the two exemptions where Regulation D of Rule 506(c) permits general advertising, solicitation and marketing of the project, and Regulation S prohibits directed selling efforts in the U.S…. [D]espite that apparent contradiction between two exemptions, it was our understanding at that time and still, that the SEC has confirmed that both exemptions could be utilized at the same time." Rita Khurdayan Depo. Tr. at 128.

[17] Moreover, because Rule 148 on "demo days" deems communications made by an issuer not to involve a general solicitation if made in connection with a public seminar or meeting, 17 C.F.R. § 230.148(a), Grybniak's comments in industry meetings indicating that an ICO was being planned by Opporty are likewise not "directed selling" as a matter of law.

sion has not provided guidance — and cites no precedent to this Court — denying a Regulation S exemption because an offering was made on a .com website accessible by foreign investors.[18]

Opporty is convinced its outside counsel-structured whitelist approach of verifying foreign status and directing all such potential investors, after independent corroboration, to a separate section of its website for access to the formal offering materials is fully compliant with the existing registration exemptions as construed to date. Grybniak Decl. ¶¶ 9, 12; Khurdayan Depo. Tr. at 125 ("We've advised [Grybniak] that the accreditation status of U.S. investors should be verified, and if he complied with the requirements of concurrent Regulation D and Regulation S, offering them the accreditation status of non-U.S. investors did not have to be verified under the framework of Regulation S."); Dilendorf Depo. Tr. at 59, 61 (Opporty's offering was structured by counsel as "a concurrent Reg. D/Reg. S offering" under which "the onboarding cabinet separated the sale into two cabinets, one for Reg. D, one for Reg. S"). In particular, because each of the exemptions was complied with independently, Opporty satisfied the SEC's integration guidance that where "each offering either complies with the registration requirements of the Securities Act, or … an exemption from registration is available for the particular offering," structuring an offering under two independent registration exemptions is explicitly permissible.[19]

The SEC recently addressed a similar issue with domestic, intrastate crowdfunding. An intrastate offering is allowed only if "offers" are limited to the citizens of one state. 17 C.F.R. § 230.147. Does posting private placement offering materials on a website violate that rule,

---

[18] Max Dilendorf Depo. Tr. at 71 ("Although the SEC has said concurrent offerings are OK, it hasn't provided clear guidance on that conflict or what sorts of activities might cross the line and require integration of the offerings").

[19] SEC, *Facilitating Capital Formation and Expanding Investment Opportunities by Improving Access to Capital in Private Markets,* Final Rule, RIN 3235-AM27, 86 Fed. Reg. 3496 (2021).

given that Internet websites are visible to everyone by virtue of the Internet's open nature? (Note that in Opporty's case, the offering materials were *not* visible or available until a potential invest-or passed applicable "whitelist" screening.) The Commission chose the position more favorable to crowdfunding, determining by way of revisions to Rule 147A that an intrastate offering may be advertised on a public website as long as the issuer accepts investments only from residents of the state in question.[20] The Commission's decision as to intrastate offerings requires, for consistency, a similar answer with respect to Reg. S, namely that the use of a single website does not as a matter of law, without more, violate either (1) the requirement that no "offers" be made in the United States, or (2) the prohibition that "no directed selling efforts" be made in the United States.

## IV. THE SPARSE JUDICIAL DECISIONS AND DICTA ON "STRICT LIABILITY" UNDER SECTION 5 DO NOT CONTROL APPLICATION OF THE STATUTE TO NEW AND UNSETTLED FINANCIAL ASSETS, SUCH THAT ADVICE OF COUNSEL CAN AND MUST BE CONSIDERED AS A FACTOR

The SEC's approach to this case represents an overreaching game of "gothca" by the federal government. Relying on dicta and off-point decisions involving other securities — and nothing related to concurrent offerings — Plaintiff contends that Section 5 liability attaches without knowledge or intent and that good faith reliance on advice of counsel is irrelevant legally. In the context of novel financial assets like cryptocurrency, that position is both perverse and indefensible.

Whether or not OPP Tokens are securities under the *Howey* test, Opporty here did everything that a law-abiding startup should do to ensure compliance with the Commission's registration exemption regulations. The company cancelled its initial ICO, refunded all funds ob-

---

[20] Revised Rule 147A allow issuers to make offers accessible to out-of-state residents (via an unrestricted publicly-available website, for example, or other form of modern mass media) so long as the sales are limited to in-state residents.

tained, retained sophisticated securities counsel, and prepared formal offering materials that re-
lied on Regulations D and S despite the uncertainty whether its ICO fell within the SEC's juris-
diction. The PPM carefully explained the risk that the Commission might conclude that utility
tokens are "securities" (PPM at 28-29) and specifically disclosed that in Opporty's ICO:

> The SAFTs will be offered and sold under the exemption provided by Section
> 4(A)(2) of the Securities Act and Regulation D promulgated thereunder, or to
> non-U.S. Persons who are not purchasing for the account or benefit of a U.S. Per-
> son as defined under Regulation S under the Securities Act.

PPM at 2-3. Coupled with counsel's advice on structuring concurrent web-based offerings using
different and independent intake and verification methods appropriate to each of Regulation D
and Regulation S investors (*see supra* at 14-15 and notes 16, 18), there was nothing more as a
practical or legal matter Opporty could, or should, have done. Contrary to the improper sug-
gestion of SEC counsel, this legally cautious approach is hardly a "tacit admission that Defend-
ants' ICO constituted offers or sales of securities." ECF 44 at 1.

It is, of course, a "common attorney-client interaction" for a client to "come[] to his law-
yer with a plan and ask[] him to find a way to implement it in a legal manner." *SEC v. Prince,*
942 F. Supp. 2d 108, 139 (D.D.C. 2013), *quoting United States v. DeFries,* 129 F.3d 1293, 1309
(D.C. Cir. 1997). With respect to applicability of the exemptions from registration on which Op-
porty relies, court decisions to date have not settled applicable law and do not support the SEC's
contention that advice of counsel is *per se* inapplicable to Section 5 registration liability.

In the Second Circuit, a securities defendant claiming advice of counsel must at the least
show that

> he made complete disclosure to counsel, sought advice as to the legality of his
> conduct, received advice that his conduct was legal, and relied on that advice in
> good faith. Even where these prerequisites are satisfied, such *reliance is not a
> complete defense, but only one factor for consideration.*

*Markowski v. SEC,* 34 F.3d 99, 105 (2d Cir. 1994) (emphasis added), *citing SEC v. Savoy Industries, Inc.,* 665 F.2d 1310, 1314 n.28 (D.C. Cir. 1981). The undisputed facts show that is precisely what occurred in this case.

It is obviously "relevant…that defendants at all times relied on the advice of counsel." *SEC v. Harwyn Industries,* 326 F. Supp. 943, 955 (S.D.N.Y. 1971). If the SEC were correct that Section 5 and related securities registration offenses are "strict liability" claims, then the purpose of allowing reliance on counsel as "one factor for consideration" pursuant to *Markowski* would be rendered meaningless. And where, as here, the Commission specifically declined to modify its generic regulations in the context of new financial assets that do not fall clearly into any previous category, "[r]ather than bringing clarity to the subject, the SEC in this case muddied the waters." *Howard v. SEC,* 376 F.3d 1136, 1142 (D.C. Cir. 2004).

While it is true that "[c]ompliance with federal securities laws cannot be avoided by simply retaining outside counsel to prepare required documents," *SEC v. Enters. Solutions, Inc.,* 142 F. Supp. 2d 561, 576 (S.D.N.Y. 2001), what Grybniak and Opporty have demonstrated here — in sharp contrast — is that they "specifically requested an attorney's advice prior to entering into a specific transaction [and] that an attorney stated that a specific transaction was legal." *SEC v. AIC, Inc.,* No. 11-CV-176-TAV-HBG, 2013 WL 5134411 (E.D. Tenn. Aug. 1, 2013), https://bit.ly/3HoJxiH. Apart from holding that the burden of proof of registration exemptions lies with a securities defendant, no case undersigned counsel found has adjudicated Regulation D or S exemptions without taking at least considering the defendants' knowledge and legal advice. The SEC's contention that "it is well-settled that the advice of counsel defense 'provides no protection against a violation of a strict liability statute like Section 5,'" ECF 44 at 2, citing *SEC v. Cavanagh,* No. 98-Civ-1818-DLC, 2004 WL 1594818, at *17 (S.D.N.Y. July 16, 2004), *aff'd*

*on other grounds,* 445 F.3d 105 (2d Cir. 2006), establishes neither, especially because the

Second Circuit has not addressed that issue on appeal.

## V.   THE FRAUD (10b-5) ALLEGATIONS ARE FACTUALLY UNSUPPORTED, IN-CORRECT, AND FAIL AS A MATTER OF LAW TO ESTABLISH MISREPRE-SENTATION, MATERIALITY OR SCIENTER

### A.   Permitting the SEC to Sue Without Proof of Reliance, Causation and Injury Violates Article III of the Constitution

Plaintiff recites as black-letter law the proposition that the agency is not required to

demonstrate that "any investor found the [allegedly false] information important or relied on De-

fendant's misstatements" in order to establish fraud liability. ECF 44 at 2-3, *quoting SEC v.*

*Jankovic,* No. 15-Civ-1248 (KPF), 2017 WL 1067788, at *12 (S.D.N.Y. Mar. 21, 2017). Alt-

hough there are many cases enunciating this purported rule, the rationale and explanation, albeit

difficult to decipher,[21] run headlong into the Article III barrier clarified by the Supreme Court

last year in *TransUnion LLC v. Ramirez,* 141 S. Ct. 2190 (2021). The requirements of Art. III

standing demand "a concrete injury even in the context of a statutory violation." *Id.* at 2205.

Under *TransUnion,* "[n]o concrete harm, no standing" because "an injury in law is not an

injury in fact." *Id.* at 2200-21. That is consistent with the long-standing Art. III constraint that a

plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute

grants a person a statutory right and purports to authorize that person to sue to vindicate that

right." *Spokeo, Inc. v. Robins,* 578 U.S. 330, 341 (2016). Consequently, the Second Circuit's

cursory reasoning that in an enforcement action (unlike private 10b-5 damages litigation),

reliance, causation, loss and damages are not relevant because "[t]he Commission's duty is to

enforce the remedial and preventive terms of the statute in the public interest, and not merely to

---

[21] *See, e.g., SEC v. Rana Research, Inc.,* 8 F.3d 1358 (9th Cir. 1993) (no reliance needed in an agency 10b-5 enforcement action since Congress by statute gave the SEC standing).

police those whose plain violations have already caused demonstrable loss or injury" is patently invalid. *Berko v. SEC,* 316 F.2d 137, 143 (2d Cir. 1963).

This is the significance of Defendants' argument regarding the absence of proof — conceded by the SEC — that *any* ICO investor regarded the alleged misrepresentations as material, relied on them, or suffered any financial or other concrete injury. Under our Constitution, a federal court may resolve only "a real controversy with real impact on real persons." *American Legion v. American Humanist Assn.,* 139 S. Ct. 2067, 2103 (2019). Without reliance, causation and harm to investors, that is, without "demonstrable loss or injury," there is nothing for this Court to ameliorate with a judgment. In even more simple terms — no harm, no foul.

## B. Defendants Are Entitled to Summary Judgment On the Misrepresentation, Materiality and Scienter Elements of the Securities Fraud Claims

Nothing the SEC alleges, or could prove based on the undisputed facts, establishes a genuine question of misrepresentation, materiality or scienter.[22] Summary judgment is appropriate when the representations in question are "so obviously [un]important to the investor, that reasonable minds cannot differ on the question of materiality." *SEC v. Research Automation Corp.,* 585 F.2d 31, 35 (2d Cir. 1978). Summary judgment thus can and should be entered for Defendants on the SEC's fraud claims.

The Complaint alleges four purportedly false or misleading statements by Opporty — and importantly ***none*** from the formal offering materials, namely the PPM and SAFTs. Each is true, not in any way misleading, and in the context of a structured offering in which all investors were explicitly cautioned only to rely on the formal offering materials — PPM at 3 ("No person has

---

[22] For a factual dispute to be genuine under Rule 56, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).

been authorized to make any statement concerning the Company or the sale of the SAFTs discussed herein other than as set forth in this Memorandum, and any such statements, if made, must not be relied upon.") — provides no evidence or even inference of materiality or scienter.

The most significant of these is addressed first.

1.    "SEC Regulated" and "SEC Compliant"

The SEC's allegation that Opporty's use of the phrase "SEC regulated," and various similar permutations, to describe its ICO in social media posts (Compl. ¶ 11) was unlawful fails because the statements are true. Regulations D and S, the codified rules under which this ICO offering was structured, are in fact SEC "regulations." It is therefore clear that referring to a Reg. D or Reg. S registration exempt offering as "SEC regulated" and the like is accurate, since the only lawful way to sell securities under U.S. law is to adhere to the applicable SEC regulations.

Opporty complied with those regulations. That the Commission now disputes their application does not change the fact of compliance in 2018. Opporty received advice of counsel on this matter specifically (Grybniak Dec. ¶¶ 25-26 & Exhs. 8, 9) and used the phraseology recommended. Defendants did not claim or suggest that the SEC had reviewed or approved its ICO. There is consequently nothing misleading about use of such language. *See, e.g.,* Dilendorf Depo. at 85 ("SEC-regulated presale" is accurate; "as is everything, SEC regulated when it comes to sale of public or private placement securities. Yeah, it is an accurate statement.").

Nor would any such statement have been even remotely important to the vast bulk of ICO investors — foreign citizens located outside of the United States. Other jurisdictions have completely different securities laws and regulations, such that the U.S. regulatory approach is by definition so "obviously unimportant" to non-U.S. investors that it cannot be deemed material as a matter of law.

With respect to scienter, *i.e.,* intent to defraud or "extreme recklessness," s*ee SEC v. Steadman,* 967 F.2d 636, 641 (D.C. Cir.1992)), as Grybniak has explained:

> I am not a native speaker. During the process of receiving legal advice, the word "compliant" was used several times by our attorneys. I assumed the term was being used correctly, and I never had any intention of defrauding any investor. For example:



Real fraudsters do not conduct themselves in this way.

Grybniak Decl. ¶ 26; *id.* Exh. 9. To prevail, the SEC must demonstrate that Grybniak "knew, should have known, or was reckless in not knowing that he was committing fraud." *SEC v. Credit Bancorp, Ltd.,* 195 F. Supp. 2d 475 (S.D.N.Y 2002). That is not possible on the record here.

### 2. "Verified Providers"/Database Entries

The SEC contends that Opporty misleadingly claimed that its website included thousands of so-called "'verified providers' willing to do business on, and contribute content to, Opporty's blockchain-based platform." Compl. ¶¶ 7-8. That is false.

From the start, Opporty differentiated explicitly between "companies in the database" and "verified company profiles," explaining that these were metrics to gauge "Initial Stage Market Opportunity." Grybniak Decl. ¶ 28 & Exh. 10. Estimates like this of the size of a target market are permissible, "forward looking" statements and cannot reasonably be construed as representations of the number of firms actually doing business on a new, in-progress transactional platform that was repeatedly described as under development and not yet launched commer-

cially. In fact, Opporty has done exactly what is disclosed, and since post-ICO launch of the platform has grown the number of active providers by several orders of magnitude (reaching nearly 6,224 as of Sept. 2021). *Id.* ¶ 17 & Exh. 5. Grybniak never promoted the Opporty platform on the basis of the number of firms "willing to do business" using OPP Tokens.[23]

> **Q     But it also implies that they're willing to do business through Opporty using OPP tokens when they can't.**
>
> A    No. Absolutely not. It was never advertised this way. We never promoted it this way.

Grybniak Decl. at ¶ 28, Exh. 11 (SEC Investigative Depo. Tr. at 187-88).

Nor is it false or misleading to state Opporty had "17 million small U.S. businesses in its business catalog or database." Compl. ¶ 8. That was true then and now. Utilizing databases for a public Internet directory in which the businesses can "claim" their profiles is a marketing practice utilized by providers such as Yelp!, Manta, Avvo, Lawyer.com and others. *Id.* ¶ 29. As a recognized expert in digital marketing, Grybniak included these companies in order to increase the ranking of the Opporty website in search engines like Google. *Id.* And contrary to the SECs allegation, the companies were in fact "real businesses eligible to conduct business on Opporty's platform." Compl. ¶ 8.

### 3.     "Misappropriated Content"

The SEC contends Opporty "misappropriated" content and ratings about particular companies in its database. Compl. ¶  8. To the contrary, Opporty used the permissible API "embedding" function offered by Yelp! for that content. Although it is unclear what the Commission means by "misappropriation," copyright issues are clearly not relevant to whether

---

[23] Listing of the SEC is also common in such directories, including on Yelp itself. Grybniak Decl. ¶ 30 & Exh. 12. Yelp! and Manta also include the SEC in their e-commerce directories. Grybniak Decl. ¶ 30 & Exh. 12. No court has held that this is fraudulent misrepresentation under the federal securities laws.

content is false or misleading. And in fact, Yelp! terminated Opporty's access to that content not because of any copyright or authorization concern, but instead because its own platform and database are competitive with Opporty. Grybniak Decl. ¶ 31 and Exh. 13 ("Opporty is more competitively aligned with Yelp than complementary; just like Yelp, Opporty serves as a discovery platform that lists local businesses and allows business owners to claim and manage their business listing and users to rate and review businesses.")

4.    <u>"Participants" and "Partners"</u>

The SEC contends Opporty "falsely represented" that a major software company was a "'partner' and/or 'participant' … in the development of Opporty's platform." Compl. ¶ 10. To the contrary, as a member through mid-2018 of Microsoft's BizSpark accelerator program for its Azure cloud services, Opporty was authorized to make that factually correct statement. Microsoft was not listed by Opporty on its website as a "partner" until July 2018, after Microsoft accepted its later application for the "Microsoft Partner Network" upon "your startup's graduation from the BizSpark program." Grybniak Decl. ¶ 32 and Exh. 14. Indeed, it is uncontested that the BizSpark program also referred to Opporty as a Microsoft "partner." *Id.* Exh. 15.

<u>**CONCLUSION**</u>

The Court should deny Plaintiff's motion and enter summary judgment for Defendants.

> Respectfully submitted,
>
> By: <u>/s/ Glenn B. Manishin</u>
> Glenn B. Manishin
> PARADIGMSHIFT LAW LLP
> 6735 Breezy Drive, Suite 101
> Warrenton, VA 20187-2716
> (202) 256-4600
> glenn@manishin.com

Dated: January 7, 2022                    *Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing was served on the following attorney for plaintiff on January 7, 2022, with consent to electronic delivery, by email:

Nicholas C. Margida
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-5720
margidan@sec.gov


/s/ Glenn B. Manishin
Glenn B. Manishin