UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------x

U.S. SECURITIES AND EXCHANGE
COMMISSION,

     **MEMORANDUM & ORDER**

    Plaintiff,    20-CV-327(EK)(MMH)


   -against-

SERGII "SERGEY" GRYBNIAK, and OPPORTY
INTERNATIONAL, INC.,

    Defendants, and

CLEVER SOLUTION INC.,

    Relief Defendant.

-----------------------------------x
ERIC KOMITEE, United States District Judge:

   The SEC filed this civil enforcement action against
Opporty International and its founder, Sergii "Sergey" Grybniak.
The complaint alleges that the defendants violated the
Securities Act of 1933 and Securities Exchange Act of 1934 in
connection with the unregistered offering of Opporty's digital
coin, the "OPP Token."

   Before the Court are the parties' cross-motions for
summary judgment.  For the reasons set forth below, the SEC's
motion is granted in part and denied in part.  The defendants'
motion is denied.

# I.   Factual Background

The following facts, set forth in the parties'
submissions, are undisputed unless otherwise specified.[1]  In
parsing this record, the Court notes the following.  First, the
majority of facts asserted by the SEC were not "specifically
controverted" by the defendants; those facts thus are "deemed to
be admitted for purposes of the [SEC's] motion."  *See* Local
Civil Rule 56.1(c).[2]  Similarly, although Defendants cross-moved
for summary judgment, they have largely failed to marshal any
affirmative evidentiary content in their own Rule 56.1
Statement.

"Rule 56.1 statements are not argument.  They should
contain factual assertions with citation to the record" and
"should not contain conclusions."  *LaBarbera v. NYU Winthrop
Hosp.*, 527 F. Supp. 3d 275, 287 (E.D.N.Y. 2021).[3]  Statements
that "are not based on personal knowledge, contain inadmissible

---

[1] This includes the SEC's Local Rule 56.1 Statement ("SEC 56.1"), ECF
No. 53; Defendants' opposition to this statement ("Def. Opp'n to SEC 56.1"),
ECF No. 59; Defendants' Local Rule 56.1 Statement ("Def. 56.1"), ECF No. 57;
the SEC's opposition and counterstatement to this statement ("SEC Opp'n to
Def. 56.1 and CS"), ECF No. 63; and the SEC's reply to Defendants' opposition
to their Local Rule 56.1 Statement ("SEC 56.1 Reply"), ECF No. 61.

[2] Local Rule 56.1(d) also provides that "[e]ach statement by the movant
. . . must be followed by citation to evidence which would be admissible."
*See also Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001)
("Local Civil Rule 56.1 statement is not itself a vehicle for making factual
assertions that are otherwise unsupported in the record.") *abrogated in part
on other grounds* by *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

[3] Unless otherwise noted, when quoting judicial decisions this order
accepts all alterations and omits all citations, footnotes, and internal
quotation marks.

hearsay, are conclusory or argumentative, or do not cite to supporting evidence" are therefore improper. *E.g.*, *Epstein v. Kemper Ins. Co.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002).

Here, the defendants' 56.1 statement cites almost exclusively to a declaration submitted by Grybniak. It asserts inadmissible legal conclusions and lay opinion testimony and relies on exhibits whose admissibility at trial is questionable at best.[4] An affidavit used to oppose or support a motion for summary judgment "must be made on personal knowledge [and] set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). Courts may disregard portions of an affidavit that set out inadmissible hearsay, conclusory statements, or legal argument. *See, e.g.*, *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 568 (E.D.N.Y. 1999); *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248 (S.D.N.Y. 2009); *Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09-CV-1410 KAM, 2012 WL 6091570 at *6 (E.D.N.Y. Dec. 7, 2012).

Accordingly, this Court has disregarded the legal conclusions and arguments, unsubstantiated opinions, and unsupported factual assertions in Defendants' Rule 56.1 Statement and Grybniak's declaration. *See, e.g.*, *Congregation*

---

[4] For example, the defendants' 56.1 statement cites to a section of Grybniak's declaration that relies on the SEC's privilege log, *id.* ¶ 12. Def. 56.1 ¶ 12 (citing Grybniak Decl. ¶ 22, Ex. 8), and to correspondence with Yelp containing potential hearsay evidence, *id.* ¶ 22 (citing Grybniak Decl. ¶ 22, Ex. 12).

*Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F.
Supp. 3d 352, 394 (S.D.N.Y. 2015) (collecting cases), *aff'd sub*
*nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of*
*Pomona, NY*, 945 F.3d 83 (2d Cir. 2019); *Schwapp v. Town of Avon*,
118 F.3d 106, 111 (2d Cir. 1997) ("To the extent that
[supporting] affidavits contain bald assertions and legal
conclusions . . . the district court [can] properly refuse[] to
rely on them."). In doing so, the Court will not "scrutiniz[e]"
and make a ruling on each line of Defendants' submissions, but
will only consider the "evidence that is admissible." *Morris,*
37 F. Supp. 2d at 569.

## A. Opporty's Business Model

Grybniak testified that he founded Opporty to create
an "ecosystem for small businesses . . . to interact
commercially" with their customers. SEC 56.1 ¶ 13. Opporty and
Grybniak marketed Opporty's website as a venue for small
businesses to sell products and services via a blockchain, using
so-called smart contracts. *Id.* ¶ 14.[5] Customers would pay for
those products using digital tokens issued by Opporty itself —
the OPP tokens. *Id.; see also id.* ¶ 16. From September 2017 to

---

[5] On a blockchain, each transaction involving digital assets is
recorded, validated, and grouped together in blocks. *Id.* ¶¶ 17-18.
Successive blocks are then linked chronologically to form the blockchain.
*Id.* These transactions are generally recorded and maintained on a public,
decentralized ledger. *Id.* ¶ 17. A "smart contract" allows for a range of
tasks to be performed, such as automated financial transactions between
parties. *Id.* ¶ 19.

October 2018 — the time period at issue in this case — Opporty
had no employees besides Grybniak; it operated through
contractors that he hired and supervised. *Id.* ¶¶ 5-8.

**B.    ICO Announcement and White Paper**

In September 2017, Opporty announced its plan for an
initial coin offering ("ICO") for the OPP Token — the digital
currency that would support purchases on its platform. *Id.*
¶ 16.  Opporty planned to issue its OPP Tokens using an already-
extant blockchain: the Ethereum blockchain. *Id.* ¶¶ 16, 19-20.
The Ethereum blockchain is a decentralized, publicly accessible
platform on which users can "define" new digital tokens. *See*
Decl. of Kendra Kinnaird, Ex. 10, Aug. 12, 2021 Expert Report of
Patrick Doody ("Doody Expert Rpt.") ¶¶ 11-12, ECF No. 54-10.

Opporty posted a "White Paper" on its website in
September 2017 describing its business model, "platform
development team," and initial plans for the ICO. *Id.* ¶¶ 23-25.
As described, the ICO would be held in two phases: in the first
phase, scheduled to begin the following month, Opporty
envisioned selling a maximum of 400 million OPP Tokens. *Id.*
¶¶ 26-27.  All unsold OPP Tokens would be offered in a second
phase held in or before October 2018, with a "hard cap" of one
billion total tokens available. *Id.* ¶ 28.  Opporty also planned
to issue up to 50 million OPP Tokens through a "bounty program"
running through the end of the second phase, which would

compensate third parties for promoting the ICO, including by posting positive articles on social media. *Id.* ¶¶ 29–30. Finally, the White Paper explained that OPP Token value would be "supported by the growth of the Opporty community," and "tied to the overall value of Opporty['s] services and to services provided at Opporty by third-party vendors and contractors." *Id.* ¶ 70.

**C.  Opporty's Promotion of the OPP Tokens and ICO**

    1.  <u>The "Whitelist"</u>

        Between October 2017 and January 2018, Opporty maintained a "whitelist" on its website through which investors could register and pre-commit to purchase OPP Tokens through the ICO. *Id.* ¶ 40. In exchange for this commitment, those investors would receive a "whitelist bonus" — up to an additional 35% in OPP Tokens. *Id.; see also id.* ¶ 47.

    2.  <u>Promotional Comments in Advance of the Pre-Sale</u>

        During the period leading up to the Pre-Sale, Defendants promoted the ICO and solicited investors through Opporty's website, their social media platforms, and other online forums. *See id.* ¶¶ 31–37. These media were accessible in the United States — despite the fact that Opporty would later seek to rely on the Regulation S exemption, which provides that SEC registration is not required for offerings conducted "offshore" (meaning, among other things, that the issuer

conducts no "directed selling efforts" in the U.S.).  *See* 17

C.F.R. § 230.903(a)(2).

The White Paper, for example, was posted on Opporty's

U.S. website.  *Id.* ¶ 32.  Defendants also promoted the ICO on

their social media pages, which were accessible in the United

States and globally.  *Id.* ¶ 34.  They paid third parties to

publish press releases and articles about the ICO on U.S.

websites, including a September 25, 2017 article published on

themerkle.com describing the structure of the ICO and the

intended use of funds (namely, to develop the platform).  *Id.*

¶¶ 35-37.  Defendants also paid purported influencers and

"experts" on blockchain and digital assets and touted the

relationship with these "advisors" in public statements.  *Id.*

¶¶ 41-43.[6]

Grybniak personally promoted the ICO at U.S. digital

asset conferences in January 2018, including in Miami and San

Francisco.  SEC 56.1 ¶ 38.  According to Opporty, "[d]uring the

events, many participants and attendees joined [Opporty's]

whitelist": Opporty reported on its website that it obtained

"pre-commitments" for its ICO "in the amount of 8 million US

Dollars."  *Id.* ¶ 39.

---

[6] The SEC does allow that Opporty did not engage in email solicitation
in connection with the ICO.  Defs. 56.1 ¶ 15.

The SEC contends that Defendants promoted and marketed Opporty's ICO of the OPP Tokens by making material misrepresentations and engaging in other deceptive conduct during the offering. ECF No. 1 ("Complaint") ¶ 6. These alleged misstatements and deceptive acts are discussed in detail below, in connection with Defendants' motion for summary judgment.

## D.    Pre-Sale Postponement

Notwithstanding the announced launch date in October 2017, Opporty postponed the "Pre-Sale" phase of the ICO multiple times. SEC 56.1 ¶¶ 44-47; *see* Doody Expert Rpt. ¶ 21. According to Grybniak, around the time of the ICO announcement, he read about the SEC's administrative proceeding against Munchee, Inc. Grybniak Decl. ¶ 7. In that proceeding, the SEC determined that an ICO run by Munchee — which had created an iPhone application that allowed users to post reviews of restaurant meals — was a securities offering. *In the Matter of Munchee Inc.* ("*Munchee*"), Securities Act Release No. 10445, 2017 WL 10605969 (Dec. 11, 2017).

Grybniak halted the Opporty ICO and retained a New York-based law firm as securities counsel. Grybniak Decl. ¶¶ 7-8. Opporty also voluntarily refunded any Ether tokens received in a 2017 presale (218 Ether, or about $65,000 at then-prevailing values, from approximately sixty investors) to

purchasers who did not want to participate in the company's subsequent private placement offering.  *Id.* ¶ 7.  Opporty then proceeded to a "restructured ICO pre-sale."  *Id.* ¶ 8.

**B.  Opporty's Pre-Sale**

The Pre-Sale ultimately began on February 5, 2018 and ran until March 10, 2018.  SEC 56.1 ¶¶ 52, 130.  In this Pre-Sale, Opporty sold investors the right to receive OPP Tokens in the future through agreements called Simple Agreements for Future Tokens ("SAFTs").  *Id.* ¶ 53.  Pursuant to Opporty's SAFT, investors were to receive those tokens automatically when Defendants publicly released what was called a "minimum viable product" — that is, when Opporty's platform met certain functionality requirements, including that users would be able to use the platform to receive, use, and purchase OPP Tokens, and to enter into smart contracts.  *Id*. ¶ 54.

1.  <u>Pre-Sale Procedures</u>

To participate in the Pre-Sale, investors were required to visit Opporty's website, where its offering materials — a private placement memorandum ("PPM") and the SAFT — were publicly available.  *Id.* ¶¶ 32, 61.  The PPM included a variety of disclaimers about the OPP tokens, including the fact that no market yet existed for the tokens, and that the SEC may deem the tokens to be securities.  Defs. 56.1 ¶ 17; PPM at 1-4, 24-26, 28-29, Defs. Ex. 1.  Investors had to acknowledge receipt

of the PPM, undergo certain verification procedures, and execute a SAFT.  SEC 56.1 ¶¶ 61, 63.

Between February 5, 2018 and March 10, 2018, Opporty "pre"-sold over 9.6 million OPP Tokens to 194 purchasers in the U.S. and abroad, raising approximately $600,000.  *Id.* ¶¶ 52, 130.  Only six out of these 194 purchasers were U.S.-based. Defs. 56.1 ¶ 16.  Investors funded their purchases by sending Ether tokens to Opporty's digital-wallet accounts on the Ethereum blockchain.  *See* SEC 56.1 ¶ 131 (detailing blockchain analysis of publicly available information about digital asset transfers).

   2.   SAFT Terms

Each of these 194 purchasers executed a SAFT, and Grybniak countersigned each SAFT on Opporty's behalf.  *Id.* ¶ 56. The SAFTs were identical for all U.S. and foreign investors. *Id.* ¶ 57.  After executing the SAFT, investors had no further investment decision to make to receive OPP Tokens.  *Id.* ¶ 55. Pursuant to the SAFT's terms, each investor purchased OPP Tokens at a price of 0.0002 ETH per OPP token.  *Id.* ¶ 58.  In addition to the 35% "whitelist" bonus, investors could receive additional bonus OPP Tokens of up to 90% of their purchase amounts, depending on the timing, amount of the investment, and the length of time the investor agreed to hold the original tokens. *Id.* ¶¶ 59–60.

3.   Pre-Sale Reporting

Defendants never filed a registration statement for Opporty's ICO of the SAFT or OPP Tokens.  *Id.* ¶ 68.  Instead, on February 20, 2018, Opporty filed a "Form D" with the SEC, which stated that the "offering was made under a claim of federal exemption under Rule 506(c) [of Regulation D] and / or Regulation S under the Securities Act of 1933."  *Id.* ¶¶ 126, 129.  Thus, the defendants invoked two exemptions — Reg. D, which applies (generally speaking) to private placements: offerings to "accredited investors" and certain others, and Reg. S, which applies to offerings made and sold offshore.  In the "Offering and Sales Amounts" section of that form, Opporty and Grybniak stated that the total offering amount was $50 million, and the total amount sold thus far was $550,000.  *Id.* ¶ 129.

B.   **Statements Made Post-Launch**

Once the ICO launched, Defendants explained — publicly — how and why the value of OPP Tokens might increase as the Opporty platform developed.  *See id.* ¶¶ 69-78. For example, on September 25, 2017, an Opporty sponsored press release stated that the OPP Token's "initial value . . . will increase as the platform develops."  *Id.* ¶ 72.  On October 5, 2017, a member of the Opporty team who purported to be Grybniak[7] stated, in a

---

[7] The article is titled "ICO Focus: Interview with Sergey Grybniak," and all answers are represented to be Grybniak's, though Grybniak has testified

written interview published in an article the following day, that "[t]he value of OPP tokens is supported by the value Opporty brings to its customers" and "Opporty's platform strives to expand its functionality, increasing the value of OPP tokens by introducing new features," while the "[v]alue of [OPP] tokens is not only stable but will rise with each step of Opporty's development." *Id.* ¶¶ 73-75. On at least one occasion, however, on January 22, 2018, Opporty told a potential investor, "We don't prediction [sic] Opporty token value [growing] in [the] future nor [are] giving promises [about] increasing price." Grybniak Decl. ¶ 20, ECF 58.

Defendants told potential investors that OPP Tokens would trade on online platforms after they issued, SEC 56.1 ¶¶ 80-82, and they pursued relationships with several such platforms. *Id.* ¶¶ 80, 85-86. In a February 7, 2018 post on "bitcointalk.org," Opporty stated that its token had already been "accepted" by the trading platform Liqui, and that Opporty was "talking to" at least two other trading platforms. *Id.* ¶ 85.

Finally, Defendants emphasized the actions they took and would take to make Opporty's platform successful. *See id.* ¶¶ 90-98. The PPM claimed that ICO proceeds would "be used by

---

that another member of his team may in fact have drafted them. *Id.* ¶¶ 73-75 (citing SEC2, SEC5).

[Opporty] to develop the technology supporting" its platform and "to build-out the decentralized network powered by blockchain and OPP token." *Id.* ¶¶ 92, 95. At the same time, Opporty told investors they would have no role in platform development and "no voting, management or control rights or other management or control rights in Opporty." *Id.* ¶¶ 102–03.

## C. Opporty's Cancellation of the ICO's Main Sale and Distribution of OPP Tokens

After the Pre-Sale, Defendants continued soliciting investors for a second phase — the "main sale" of Opporty's ICO. *Id.* ¶¶ 104–05. After multiple postponements, however, Opporty announced in late October 2018 that there would be no main sale. *Id.* ¶¶ 106–07. Instead, Defendants listed OPP Tokens on the BTCEXA, a digital-asset trading platform based in Australia. *Id.* ¶¶ 87, 107. Around the same time, Defendants announced Opporty's platform had achieved "minimum viable product" status, and they would begin distributing OPP Tokens to SAFT participants whose vesting periods had ended. *Id.* ¶¶ 108–09. On October 31, 2018, Opporty began distributing OPP Tokens, and ultimately distributed over 9.6 million tokens, to Pre-Sale participants. *Id.* ¶¶ 109–11. Opporty distributed another 1.7 million tokens to bounty program participants roughly a year later, in October 2019. *Id.* ¶¶ 114–15.

Ultimately, Opporty raised roughly $600,000 through its Pre-Sale but never registered the sale with the SEC. *Id.* ¶¶ 52, 68, 130.

## II.  Procedural Background

The SEC commenced this action on January 21, 2020, bringing six claims.  The first three allege that both defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, as well as Sections 5(a) and 5(c) and Section 17(a) of the Securities Act. Compl. ¶¶ 161–71.  The Commission also included three additional counts against Grybniak for aiding and abetting Opporty's violations of the above statutes. *Id.* ¶¶ 172–80.

Following discovery, the two sides cross-moved for summary judgment.  The SEC moves for partial summary judgment — on its Section 5 claims. *See* SEC Mem. Supp. Mot. Partial Summary J. ("SEC Mem."), ECF No. 52.  Defendants likewise move as to the Section 5 claims, and also seek summary judgment on the SEC's fraud claims — the alleged violations of Section 10(b) and Rule 10b-5.  See Defs. Mem. Supp. Mot. Partial Summary J. & Opp'n to SEC Mot. Partial Summary J. ("Defs. Mem."), ECF No. 56.

## III. Legal Standard

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed R. Civ. P. 56(a). "A fact is material for these purposes if it might affect the outcome of the suit under the governing law. An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001).

The moving party has the burden of demonstrating the absence of a question of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant carries its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). In doing so, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). The entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Where there are cross-motions for summary judgment, the court considers each motion independently and views the facts in the light most favorable to the non-moving party for each. *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

### IV. Cross-Motions on the Section 5 Violation

Both sides move for summary judgment on the issue of Opporty and Grybniak's liability under Section 5. They dispute, first and foremost, whether the OPP Tokens are, in fact, securities under the Securities Act. Assuming they are, the parties dispute whether any exemption to Section 5's registration requirement applies. Defendants also assert that the Securities Act's definition of "security," as applied to Opporty's ICO, is unconstitutionally vague, and that their reliance on counsel precludes strict liability under Section 5.

### A. Legal Standards for Section 5 of the Securities Act

Sections 5(a) and (c) of the Securities Act make it "unlawful for any person, directly or indirectly" to "sell," "offer to sell," or "offer to buy," a "security" unless a registration statement is in effect or has been filed as to such security. 15 U.S.C. §§ 77e(a), (c). To state a Section 5 claim, the SEC must show: (1) the lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate commerce in

connection with the offer or sale. *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006). Once the SEC has established a prima facie case of a Section 5 violation, the burden shifts to the defendants to establish that a valid exemption applies. *Id.* Defendants here assert that such an exception does apply (in their Fifteenth Affirmative Defense). Am. Answer at 17.

As to the prima facie case, the parties agree that Opporty offered the OPP Tokens (via the SAFTs) in interstate commerce without filing a registration statement. It is also undisputed that Grybniak is and was, at all relevant times, Opporty's founder, sole owner, and sole officer. SEC 56.1 ¶ 1. As laid out in greater detail below, the vast majority of actions taken by Opporty were taken by Grybniak himself. The only disputed element, then, is whether the OPP Tokens constitute "securities" — and specifically, "investment contracts" as defined by the Securities Act, 15 U.S.C. § 77b(a)(1).

## B. The *Howey* Test

To identify an investment contract, courts rely on the familiar test originally set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Under *Howey*, an investment contract refers to a "contract, transaction or scheme" in which a person makes: (1) an investment of money, (2) in a common enterprise, (3) with a reasonable expectation of profits to be derived from the

entrepreneurial or managerial efforts of others.  328 U.S. at 298-99; *see also SEC v. Edwards*, 540 U.S. 389, 393 (2004).  In analyzing whether a contract, transaction, or scheme is an investment contract, "form should be disregarded for substance and the emphasis should be on economic reality."  *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

      Prior to the proliferation of cryptocurrencies, most cases applying the *Howey* test often involved instruments that granted the purchaser some legal claim to the assets or profits of the promoter's business.  Digital assets sold in initial coin offerings often lack these features.  Nevertheless, the overwhelming majority of courts assessing digital tokens sold in ICOs have concluded that they are investment contracts within the meaning of the Securities Act.  *See, e.g.*, *Friel v. Dapper Labs, Inc.*, 657 F.Supp.3d 422, 433 (S.D.N.Y. 2023) (compiling ICO cases).  I reach the same conclusion here as to the OPP tokens.

      In reaching this conclusion, I am guided by the principles first articulated in *Howey* and reiterated by courts in the seventy-five years since.  The *Howey* Court explained that its formulation of an investment contract "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of

profits." 328 U.S. at 299. In regulating the securities market, Congress recognized the "virtually limitless scope of human ingenuity" and "painted with a broad brush" as the "best way to achieve its goal of protecting investors." *Reves v. Ernst & Young*, 494 U.S. 56, 60–61 (1990). Accordingly, courts have considered a variety of unconventional schemes and contracts involving a wide range of assets to be investment contracts "in light of the economic reality and the totality of circumstances surrounding the sales." *See, e.g.*, *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1034–35 (2d Cir. 1974) (whiskey warehouse receipts); *Cont'l Mktg. Corp. v. SEC*, 387 F.2d 466, 470–71 (10th Cir. 1967) (investment contracts for sale and management of live beavers); *Miller v. Cent. Chinchilla Grp., Inc.*, 494 F.2d 414, 417 (8th Cir. 1974) (contracts for sale of chinchillas); *Howey*, 328 U.S. at 293 (land sales and service contracts for orange groves).

With this framework in mind, we turn to the *Howey* factors.

1. <u>Investment of Money</u>

Defendants do not dispute that the first prong of the *Howey* test is satisfied. Investors made an "investment of money" by paying Ether, a virtual currency, in exchange for the future delivery of OPP Tokens. SEC 56.1 ¶¶ 58, 131.

2. <u>Common Enterprise</u>

The second prong of *Howey*, the existence of a "common enterprise," can be established through a showing of "horizontal commonality." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). Horizontal commonality is marked, generally speaking, by "the tying of each individual investor's fortunes to the fortunes of the other investors." *Id.* This may be evidenced by the pooling of the investors' assets to further "the profitability of the enterprise as a whole." *Id.*; *see also SEC v. SG Ltd.*, 265 F.3d 42, 49 (1st Cir. 2001) ("[H]orizontal commonality [is] a type of commonality that involves the pooling of assets from multiple investors so that all share in the profits and risks of the enterprise."). While this pooling is "usually combined with the pro-rata distribution of profits," *Revak*, 18 F.3d at 87, a "formalized profit-sharing mechanism is not required for a finding of horizontal commonality." *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 353 (S.D.N.Y. 2019); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020) ("[R]eceiving a pro-rata distribution of profits . . . is not required for a finding of horizontal commonality").

Indeed, another district court recently rejected the argument that horizontal commonality (or an investment contract more generally) requires "the formal imposition of post-sale obligations on the promoter or the grant to an investor of a right to share in profits." *SEC v. Ripple Labs, Inc.*, 682 F.

Supp. 3d 308, 322 (S.D.N.Y. 2023), *motion to certify appeal denied*, 697 F. Supp. 3d 126 (S.D.N.Y. 2023).  Instead, that court reasoned, the "Supreme Court's use of the word 'profits' in *Howey* was intended to refer to 'income or return,' and financial returns on investments are not equivalent to post-sale obligations or profit sharing."  *Id.* (quoting *Edwards*, 540 U.S. at 394).[8]

The record in this case establishes horizontal commonality.  The material facts are not disputed: Opporty raised approximately $600,000 from its sales of the OPP Tokens and pooled the sales proceeds in five of its Ethereum wallets.  SEC 56.1 ¶¶ 130, 131, 134 & n.12 (citing the Amended Answer, Doody Expert Rpt., and the Defendants' "Crypto wallet.xlsx," SEC48).  Opporty then used these funds to develop the Opporty Ecosystem and otherwise fund its business.  *Id.* ¶¶ 88–89, 96; Grybniak Decl. ¶ 14 ("All of the proceeds of the ICO were spent on platform development as described and disclosed in the PPM.").

Several courts have found this prong satisfied based on just this type of pooling.  In *Kik Interactive*, the token

<hr/>

[8] *See also Edwards*, 540 U.S. at 390 ("The profits this Court was speaking of in *Howey* are profits — in the sense of the income or return — that investors seek on their investment, not the profits of the scheme in which they invest, and may include, for example, dividends, other periodic payments, or *the increased value of the investment*."); *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975) ("By profits, the Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds.").

could be used in a "digital ecosystem" to buy and sell "digital products and services," much like the instant case. 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020). The court found a common enterprise because the defendants sold their token, deposited the proceeds into a single bank account, and used those funds to further their operations, "including the construction of the digital ecosystem it promoted." *Id.* at 178.

Similarly, another court recently found a common enterprise where the defendant "pooled the proceeds of its Institutional Sales into a network of bank accounts under the names of its various subsidiaries," and then used those funds "to promote and increase the value of XRP by developing uses for XRP and protecting the XRP trading market." *Ripple Labs, Inc.*, 682 F. Supp. 3d at 316. In yet another example, the SEC established horizontal commonality by showing that a defendant had "pooled the money received from the Initial Purchasers [of its new cryptocurrency, Grams] and used it to develop [its] TON Blockchain." *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 369 (S.D.N.Y. 2020); *see also Balestra*, 380 F. Supp. 3d at 353 (finding a common enterprise because "the funds raised through the ICO were pooled together to facilitate the launch of the ATB Blockchain, the success of which, in turn, would increase the value of Plaintiff's ATB Coins").

In Opporty's operational model, the fortunes of each OPP Token purchaser were tied to Opporty's fortunes and the fortunes of other purchasers. The digital tokens would be worthless if the platform failed to achieve critical mass (or, according to the lexicon of Opporty's SAFT, if Opporty failed to develop the "Minimum Viable Product"). On the other hand, if Opporty successfully deployed the pooled proceeds of the ICO to develop its platform, the value of the OPP Token holders' investments would appreciate collectively. As Opporty itself "recognized" and "emphasized," the "success of the ecosystem [would drive] demand for [OPP Tokens] and thus dictate[] investors' profits." *See Kik*, 492 F. Supp. 3d at 178 (discussing the ways in which token investors' fortunes would rise or fall together); *see also* SEC 56.1 ¶¶ 72-75 (citing SEC5, December 2018 "Interview with Sergey Grybniak of Opporty" article) ("Opporty's platform strives to expand its functionality, increasing the value of OPP tokens by introducing new features.").

Like the defendants in *Kik*, Opporty "investors reaped [or expected to reap] their profits in the form of the increased value" of OPP tokens. *Id.* The value of Opporty's token would be "dictated by the success of the . . . enterprise as a whole, thereby establishing horizontal commonality." *Balestra*, 380 F. Supp. 3d at 354; *see also Telegram*, 448 F. Supp. 3d at 369 ("The

ability of each Initial Purchaser to profit was entirely
dependent on the successful launch of the TON Blockchain.  If
the TON Blockchain's development failed prior to launch, all
Initial Purchasers would be equally affected as all would lose
their opportunity to profit.").

Thus, the record demonstrates the existence of a
common enterprise.

3.    Reasonable Expectation of Profits

The third prong of the *Howey* test asks whether the
purchaser of the instrument in question reasonably expects
"profits to be derived from the entrepreneurial or managerial
efforts of others."  *United Hous. Found., Inc. v. Forman*, 421
U.S. 837, 852 (1975).  This prong contemplates two related, but
ultimately conceptually distinct, showings: first, that the ICO
purchasers bought the tokens with an eye towards "profiting"
from that purchase, rather than a consumptive purpose; and
second, that they were looking to the vision and labor of others
as the fount of that profit.  *Telegram*, 448 F. Supp. 3d at 371;
*Balestra*, 380 F. Supp. 3d at 355.

The Second Circuit has construed this prong fairly
broadly, directing courts to "consider whether, under all the
circumstances, the scheme was being promoted primarily as an
investment or as a means whereby participants could pool their
own activities, their money and the promoter's contribution in a

meaningful way." *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008). Under *Howey*, the term "profits" refer to "income or return, to include, for example, dividends, other periodic payments, or the increased value of the investment." *Edwards*, 540 U.S. at 390.

In this vein, courts distinguish investment intent from acquisitive purpose. A purchase contract "does not fall within the scope of the securities laws when a reasonable purchaser is motivated to purchase by a consumptive intent." *Telegram*, 448 F. Supp. 3d at 371 (citing *Forman*, 421 U.S. at 852–53). This "inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant." *Id.*

Based on the totality of circumstances, a reasonable investor would have purchased the OPP Tokens with the expectation that they would derive profits from Opporty's efforts. From Opporty's communications, marketing campaign, and the nature of the ICO, it is clear that the company asked investors to conclude that the tokens would appreciate in value through Opporty's development of its online platform. Three categories of evidence support this conclusion: (1) Defendants' public statements describing how OPP Tokens' value would increase through their efforts, including their development of the platform; (2) Defendants' promises to list OPP Tokens on

secondary trading platforms, ensuring liquidity; and (3) the nature of ICO Pre-Sale, which incentivized early investment at a time when OPP Tokens had no consumptive utility.

a. Opporty's Public Statements

First, Grybniak and Opporty predicted in various media — including Opporty's White Paper, SEC 56.1 ¶ 70; press releases, *id.* ¶¶ 71-72; and an interview, *id.* ¶¶ 75-76 — that the OPP Tokens would increase in value as the Opporty platform developed. "Promotional materials emphasizing opportunities for potential profit can demonstrate that purchasers possessed the required expectation of profits." *Telegram*, 448 F. Supp. 3d at 373.

Public statements and communications such as these, that promote the digital token's anticipated increase in value as the defendant company develops its network are indicative of a "reasonable expectation of profits." *See Kik*, 492 F. Supp. 3d at 179-80; *see also United States v. Zaslavskiy*, No. 17-CR-647, 2018 WL 4346339, at *6 (E.D.N.Y. Sept. 11, 2018) (indictment satisfied *Howey*'s third prong by alleging ICO token at issue "was described to investors as 'an attractive investment opportunity' which 'grows in value,' and as having 'some of the highest potential returns'"). The court in *Kik* had little trouble determining that the sale of Kin tokens satisfied the expectation-of-profit prong, finding that Kik had "extolled

"Kin's profit-making potential" in public statements and at public promotional events, including by emphasizing "the role of supply and demand in driving the value of Kin." *Id.* Specifically, "Kik was offering only a limited supply of Kin, so as demand increased, the value of Kin would increase, and early purchasers would have the opportunity to earn a profit." *Id.*

Another court examining this third prong in detail — also on cross-motions for summary judgment — concluded that a digital token at issue, which operated much like the OPP token, satisfied the expectation-of-profit requirement. *See SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 220 (D.N.H. 2022).[9] The court highlighted statements that encouraged potential investors to expect profits — specifically, that the token was being traded at a "healthy clip" on major cryptocurrency exchanges and "should appreciate." *Id.* at 217; *see also id.* at 220 (noting that "LBRY's profitability turned on its ability to grow the value of LBC by increasing usage of the LBRY Network"). Similarly, in *Balestra*, the defendants' marketing campaign for ATB Coins — including in press releases and on their website — "highlighted the potential profits that would result simply from holding those coins" in satisfaction of this prong of the *Howey* test. 380 F. Supp. 3d at 355.

---

[9] The LBRY Credits in that case could be spent on activities on LBRY's blockchain, such as publishing content, creating and promoting channels, tipping content creators, and purchasing paywall content. *Id.*

The Opporty statements quoted above, and others, indicated that the tokens would appreciate because of Opporty's entrepreneurial and managerial efforts, not any effort on the part of OPP Token holders.  SEC 56.1 ¶¶ 76-78, 90-98 (citing Grybniak's deposition testimony, a 2017 article about Opporty, and Opporty's White Paper, among other sources).  Opporty's PPM told investors (and Grybniak confirmed at his deposition) that they would have no role in developing the platform.  *Id.* ¶¶ 102-03.  These statements are similar to those that the *Kin*, *LBRY*, and *Balestra* courts found sufficient to satisfy the third *Howey* prong.  For example, in *Kin*, the court found that Kik's statements that it would "provide startup resources, technology" and would "foster an ecosystem" by "creating a series of new products, services, and systems" demonstrated that "demand for Kin, and thus the value of the investment . . . would rely heavily on Kik's entrepreneurial and managerial efforts."  *Kin*, 492 F. Supp. 3d at 180; *see also LBRY*, 639 F.Supp 3d at 220 (LBRY signaled that "it would work diligently to develop the Network so that LBC would increase in value" for both its purchasers and LBRY); *Balestra*, 380 F. Supp. 3d at 355-56 (complaint pleaded that "the success of ATB Coins was entirely dependent on Defendants' following through on their promise to launch and improve the ATB Blockchain" and ATB Coin purchasers

"had no control over whether the new ATB Blockchain technology worked").

Defendants, for their part, do not meaningfully contest that evidence. Instead, they note that neither the PPM nor SAFTs *promised* that the tokens would increase in value or be tradeable on a secondary market. Defs. Mem. at 8 (citing Grybniak Decl. ¶ 18). Defendants also point to a January 22, 2018 social media post in which an Opporty contractor disavowed any promise or prediction of "increasing price" for the OPP Tokens. *Id.* at 9. "Disclaimers, if contrary to the apparent economic reality of a transaction, may be considered by the [c]ourt but are not dispositive." *Telegram*, 448 F. Supp. 3d at 365. Here, Opporty's late-breaking "disclaimers," "cannot undo" Oppporty's prior representations or "the objective economic realities of a transaction." *LBRY*, 639 F.Supp.3d at 219 (granting summary judgment despite evidence that LBRY informed some potential purchasers of LBC that the company was not offering its token as an investment).

b. Plans to List on a Trading Platform

Second, Defendants told potential investors that they would generate liquidity for OPP Tokens by listing them on secondary trading platforms. SEC 56.1 ¶¶ 79-86 (citing the Opporty White Paper, Grybniak's deposition testimony, and various social media posts). Statements such as these,

regarding the possibility of "resale in the secondary market" are "crucial to the investor" with respect to the expectation of "realizing profits from capital appreciation." *Gary Plastic Packaging Corp. v. Merrill Lynch, Peire, Fenner & Smith, Inc.*, 756 F.2d 230, 240 (2d Cir. 1985); *see also, e.g.*, *Kik*, 492 F. Supp. 3d at 179–80 (noting Kik's statements that Kin would be "tradable on the secondary market through cryptocurrency exchanges"); *Balestra*, 380 F. Supp. 3d at 356 n.14 ("Purchasers' ability to resell ATB Coins on other exchanges also supports the conclusion that the coins are securities.").

      c. Nature of the OPP Tokens

      Third, the nature of the OPP Tokens and ICO indicates an investment, rather than a *purely* consumptive, purpose.  As courts in this and other circuits have held, "[t]he reasonable expectation of profits from the efforts of others need not be the sole reason a purchaser buys an investment; an asset may be sold for both consumptive and speculative uses." *Ripple Labs*, 682 F. Supp. 3d at 326.  Defendants' primary response to the SEC's claims is that the OPP Token is a "utility token" for consumptive use — namely, to facilitate commercial transactions on the Opporty platform — not with any intention of return on investment. *See* Defs. Mot. at 8.  According to Defendants, purchasers bought this "digital utility currency" simply "to be used rather than see[] an appreciation of value." *Id.*  That

consumptive use, they argue, is consistent with the financial realities of Opporty's commercial platform, where buyers and sellers would expect to transact for goods and services at stable, non-fluctuating prices.  *Id.*

At the time of ICO, however, the OPP Tokens had "no inherent value," and any value would materialize only if Opporty's digital ecosystem "turned out to be successful."  *See Kik*, 492 F. Supp. 3d at 180.  Opporty, moreover, used bonuses and incentives to encourage investors to purchase *and hold* their OPP Tokens.  For example, under the terms of the SAFT, once the SAFT converted to OPP tokens, the tokens were subject to a mandatory one-month vesting period, during which they had no consumptive utility.  Grybniak Decl., Ex. 2 at 6.  Thus, no pre-sale tokens were purchased for present consumption, nor could any reasonable investor conclude that they were.  Opporty provided additional OPP Tokens to purchasers who agreed to a twelve-month "vesting" period, rather than one month.  *See* SEC 56.1 ¶¶ 40, 59-60, 116-121.  Such bonuses provided Pre-Sale investors with the ability to profit more by delaying consumption.  Also, according to the PPM, "investors" who invested in a SAFT during the first three days of the pre-sale qualified for bonus tokens.  PPM at 21.  These bonuses were fixed and preceded the accrual of any utility in the OPP tokens.

Taken together, these features of the ICO "are inconsistent with the notion that [OPP Tokens were] used as a currency or for some other consumptive use." *Ripple Labs*, 682 F. Supp. 3d at 328. "Simply put, a rational economic actor would not agree to freeze [thousands] of dollars . . . if the purchaser's intent was to obtain a substitute for fiat currency." *Telegram*, 448 F. Supp. 3d at 373.

Further, the defendants' "utility token" characterization does little to counteract the evidence that Opporty sold the OPP Tokens to raise money to build out its platform — which was not functional at the time of the ICO — based on representations that purchasers would see their tokens increase in value once the platform was up and running.

Other courts have likewise rejected arguments that a digital asset's "consumptive use" precludes it from being an investment contract. In *Kik*, for example, the defendant company characterized Kin as a "general purpose cryptocurrency for use in everyday digital services" on its platform. 492 F. Supp. 3d at 180. As the court reasoned, however, none of the tokens' "consumptive use" was available when they were distributed, and such use "would materialize only if the enterprise advertised by Kik turned out to be successful." *Id.* As a result, any value that Kin would realize would depend on the efforts of Kik to develop its online platform. *See id.*; *see also Telegram*, 448 F.

Supp. 3d at 367 (rejecting argument that digital token would have "functional consumptive uses" and should be considered a commodity instead of a security); *see also LBRY*, 2022 WL 16744741, at *7 ("Nothing in the case law suggests that a token with both consumptive and speculative uses cannot be sold as an investment contract.").

Such is the case here: OPP Tokens had no value outside of Opporty's promised digital ecosystem, and only through Opporty's efforts to develop an in-demand ecosystem would the OPP Tokens grow in value and generate a profit *in the future*. Indeed, Opporty's platform was not operational until 2019, Defs. 56.1 ¶ 120, and during the pre-sale and ICO, businesses and consumers were unable to transact business in OPP Tokens or on the platform.  SEC 56.1 ¶ 120.

In short, the evidence demonstrates that the Defendants' ICO of its OPP Tokens constituted an unregistered offer and sale of investment contracts, in violation of Section 5 of the Securities Act.

### 4. Defendants' Vagueness Defense

Defendants assert a due process defense to the Section 5 claim, arguing that the SEC's guidance about crypto offerings has been so vague and arbitrary that investors have not had sufficiently definite warning about how the *Howey* test might apply.  Defs. Mot. at 10-11.  They further assert that the SEC

acted arbitrarily in bringing this enforcement action against them when settling or declining to challenge "scores of other digital token ICOs," *id.* at 12. Neither argument, however, is convincing.

The Fifth Amendment's Due Process Clause requires that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is "impermissibly vague" and thus invalid if it: (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Copeland v. Vance*, 893 F.3d 101, 114 (2d Cir. 2018); *accord Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006). This inquiry is an objective one: "Courts ask whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed, not whether a particular [party] actually received a warning that alerted him or her to the danger of being held to account for the behavior in question." *Dickerson v. Napolitano*, 604 F.3d 732, 745-46 (2d Cir. 2010).

First, the term "investment contract" — as defined by the Securities Act, 15 U.S.C. § 77b(a)(1), and subsequent case law — provides a person of ordinary intelligence with adequate

notice to understand what assets and transactions fall within
its scope.  Although the application of the *Howey* test to new
facts can raise interpretive questions, that is inherent in the
application of existing law to any new technology.  The fact
that a body of law involves an "inherently individualized and
fact-specific inquiry" does not render it constitutionally
vague.  *Clavin v. Cnty. of Orange*, 38 F. Supp. 3d 391 (S.D.N.Y.
2014), *aff'd*, 620 F. App'x 45 (2d Cir. 2015).

More importantly, the Second Circuit has foreclosed
the defendants' vagueness challenge: confronted with the
argument that the term "investment contract" is void for
vagueness, it held (albeit in a footnote) that "position to be
untenable."  *SEC v. Brigadoon Scotch Distrib. Co.*, 480 F.2d
1047, 1052 n.6 (2d Cir. 1973).[10]

Consistent with the *Brigadoon* footnote, one court
opined more recently that "the test expounded in *Howey* has — for
over 70 years — provided clear guidance to courts and litigants
as to the definition of 'investment contract' under the
securities laws."  *Zaslavskiy*, 2018 WL 4346339, at *9.  Clear

---

[10] This should be dispositive, as void-for-vagueness challenges are
directed at the statute itself, and thus not assessed on an "as applied," or
case-by-case, basis.  *See, e.g.*, *Johnson v. United States*, 576 U.S. 591, 603
(2015) ("If we hold a statute to be vague, it is vague in all its
applications . . . ."); *but see United States v. Rybicki*, 354 F.3d 124, 129
(2d Cir. 2003) ("Panel opinions of this Court have repeatedly held that when,
as in the case before us, the interpretation of a statute does not implicate
First Amendment rights, it is assessed for vagueness only "as applied," i.e.,
in light of the specific facts of the case at hand and not with regard to the
statute's facial validity.")

*enough*, at least.  This "extensive body of case law," which

provides "guidance on how to apply that test to a variety of

factual scenarios," provides constitutionally sufficient notice,

including in the age of digital assets.  *Kik*, 492 F. Supp. 3d at

183; *see, e.g.*, *Zaslavskiy*, 2018 WL 4346339, at *9; *Ripple Labs*,

682 F. Supp. 3d at 331-32; *LBRY*, 639 F. Supp. 3d at 221

(rejecting fair notice argument).[11]

 Second, and for similar reasons, Section 5 "provides

sufficiently clear standards to eliminate the risk of arbitrary

enforcement."  *Kik*, 492 F. Supp. 3d at 183.  "*Howey* is an

objective test that provides the flexibility necessary for the

assessment of a wide range of contracts, transactions, and

schemes."  *Ripple Labs,* 682 F. Supp. 3d at 332.  Defendants

point to SEC officials' varied — and arguably shifting — public

statements on the issue, as well as the absence of enforcement

actions against other digital token issuers.  But in making

their vagueness argument, the defendants identify no SEC

guidance suggesting that the OPP Token offering *itself* was

Section 5 compliant.  And "the law does not require the

---

[11] The Supreme Court has indicated that the clear guidance sufficient to overcome a vagueness challenge can come from case law as well as the statute itself.  *See Screws v. United States,* 325 U.S. 91, 104 (1945) ("For the specific intent required by the Act is an intent to deprive a person of a right which has been made specific *either* by the express terms of the Constitution or laws of the United States *or* by decisions interpreting them.") (emphasis added); *United States v. Lanier,* 520 U.S. 259, 266 (1997) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute *nor any prior judicial decision* has fairly disclosed to be within its scope."); *Ortiz v. N.Y.S. Parole in Bronx, N.Y.*, 586 F.3d 149, 158 (2d Cir. 2009) (same).

Government to reach out and warn all potential violators on an individual or industry level." *Kik*, 492 F. Supp. 3d at 183 (citing *Dickerson* and rejecting same argument). In the end, the term "investment contract" and "judicial interpretations thereof, as well as regulatory guidance, provide sufficiently clear standards to eliminate any risk of arbitrary enforcement of the securities laws." *Zaslavskiy*, 2018 WL 4346339, at *9.[12]

The Defendants' vagueness challenge therefore fails.

## C. Applicable Exemptions from the Registration Requirement

"Once the SEC has made a prima facie case [of a Section 5 violation], the burden shifts to the defendant to show that the securities were exempt from the registration requirement*." Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998). "Registration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public." *Cavanagh*, 445 F.3d at 115. The defendants have not carried this burden.

---

[12] As noted above, the defense also challenges the SEC's ostensibly arbitrary (or selective) enforcement action — that is, the Commission's decision to bring this action despite settling with, or declining to pursue, other cryptocurrency issuers. Defs. Mot. at 12. But the defendants have not invoked the equal protection clause (in respect of a selective-enforcement claim) or asserted an Administrative Procedure Act challenge (in respect of alleged arbitrariness). The assertion that others have engaged in similar conduct without being subject to enforcement action is not, of course, a defense, absent some indication that the defendant is in a protected class, is being retaliated against for the exercise of a constitutional right, or the like. *See, e.g., SEC v. LBRY, Inc.,* No. 21-CV-260-PB, 2022 WL 356772 (D.N.H. Feb. 7, 2022) (rejecting selective enforcement challenge by SEC in context of ICO offering).

The defendants contend that Opporty's ICO was exempt because it satisfied two exemptions: for the onshore (i.e., U.S.-based) purchasers, the transaction satisfied Rule 506(c) of Regulation D (for offerings to accredited investors).  And they contend that transactions with non-U.S. purchasers satisfied Regulation S (for offshore offers and sales).  Defs. Mem. at 13–17.  The SEC disputes the second of these assertions — as to Reg. S — but not the first (at least not directly).

1.  Regulation D and Regulation S

Offers and sales that comport with Rule 506 of Regulation D are "transactions not involving any public offering" and are thus exempt from registration.  17 C.F.R. § 230.506(a); 15 U.S.C. § 77d(a)(2).  To satisfy Rule 506(c)'s requirements, an issuer must, among other requirements, "take reasonable steps to verify" that "[a]ll purchasers" are "accredited investors" as defined in Rule 501(a).  17 C.F.R. § 230.506(c)(2).  Accredited investors are presumed to be able to demand access to information otherwise required by a securities registration statement, or otherwise able to bear financial loss.  *See generally SEC v. Ralston Purina Co.*, 346 U.S. 119, 125 (1953) ("An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'").

Regulation S, in turn, provides an exemption for "offers and sales that occur outside the United States." 17 C.F.R. § 230.901; *SEC v. Boock*, No. 09-CV-8261, 2011 WL 3792819, at *20 (S.D.N.Y. Aug. 25, 2011). For purposes of Section 5, an offer or sale of securities occurs outside the United States if, among other conditions, (1) the offer and sale constitute an "offshore transaction" and (2) the issuer makes no "directed selling efforts" in the United States.[13] 17 C.F.R. § 230.903(a). An "offshore transaction" occurs when: (1) the offer or sale is "not made to a person in the United States" and (2) either (a) the buyer is outside of the United States (or the offeror reasonably believes him to be so), or (b) the transaction is executed on an established foreign securities exchange or designated offshore securities market. *Id.* § 230.902(h). The phrase "directed selling efforts," in turn, refers to "any activity undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States" for the securities being offered in reliance on Regulation S. *Id.* § 230.902(c).

An issuer may conduct simultaneous offerings under Regulation D and Regulation S without the onshore (Reg. D) sales tainting the offshore (Reg. S) component. "Regulation S may be

---

[13] This prohibition also extends to "any person acting on behalf" of the issuer. *Id.*

relied on for such offers and sales even if coincident offers and sales are made in accordance with Regulation D inside the United States." 17 C.F.R. § 230.500; *see also* 17 C.F.R. § 230.152(b)(2). Put differently, "[o]ffshore transactions made in compliance with Regulation S will not be integrated with registered domestic offerings or domestic offerings that satisfy the requirements for an exemption from registration under the Securities Act, even if undertaken contemporaneously." SEC Release No. 6863, 46 SEC Docket 52 (April 24, 1990); *see* SEC Release No. 33-9415 § 4, 78 Fed. Reg. 44771 (July 10, 2013) ("Concurrent offshore offerings that are conducted in compliance with Regulation S will not be integrated with domestic unregistered offerings that are conducted in compliance with Rule 506."). All this assumes, however, that the two components will — taken separately — satisfy Reg. D and Reg. S, respectively. *See id.* ("Concurrent offshore offerings that are conducted *in compliance* with Regulation S will not be integrated with domestic unregistered offerings that are conducted *in compliance* with Rule 506. . . .") (emphasis added).

2.  Opporty's ICO Failed to Comply with Regulation S

The SEC's primary response to the defendants' exemption claims relates to the second requirement of Regulation S: in connection with the ICO Pre-Sale, the SEC contends, the defendants "undisputedly engaged in 'directed selling efforts'

40

in the U.S." SEC Mem. at 21. They are correct: the uncontroverted evidence establishes such directed selling efforts. Accordingly, the defendants cannot claim the Reg. S exemption.

The defendants *do* point to evidence of their last-ditch efforts to qualify for exemptions (generally). They claim that, as "recommended by the lawyers," they began, in or after January 2018, to vet U.S. purchasers for accredited-investor status (Reg. D), and they "routed" "foreign investors" to a "separate section" of the Opporty website "devoted solely to non-U.S. citizens" (Reg. S). Grybniak Decl. ¶ 12; *see also* SEC 56.1 ¶ 64 (citing SEC28, screenshot of Opporty's website); Kinnaird Decl., Ex. 1, SEC1, Grybniak Dep. Tr. 173:3-5.[14]

But Reg. S cannot be satisfied by an issuer who engages in directed selling efforts in the United States. And there is no genuine dispute on this point: Opporty did so. As the SEC has explained, directed selling efforts can include activities such as placing advertisements in a publication with general circulation in the United States, 17 C.F.R. § 230.902(c)(1), or conducting promotional seminars in the United States, SEC Release No. 6863, 46 SEC Docket 52 (Apr. 24, 1990).

---

[14] Opporty also included language required by Rule 506 in the PPM and SAFTs, and filed a Form D with the SEC. Grybniak Decl. ¶ 12.

As discussed above, the defendants made Opporty's offering materials, including the White Paper, PPM, and SAFT, publicly available on the company's website. SEC 56.1 ¶ 32. Opporty discussed the ICO on social media platforms (including Facebook, Twitter, and YouTube) and other online forums. SEC *Id.* ¶ 31.[15]  Grybniak touted the ICO at digital asset conferences in the United States, including in San Francisco and Miami in January 2018.  *Id.* ¶ 38.  The defendants paid digital asset "advisors" located in the U.S. to promote the OPP Tokens. *Id.* ¶¶ 41-43 (these advisors were purported experts and influencers in the blockchain and digital asset space, whom Opporty and Grybniak retained and advertised on their website as affiliates).  Through the efforts of these advisors and the company itself, the Opporty ICO was discussed in "sponsored" press releases, articles, and other content published on third-party websites.  *Id.* ¶¶ 34-36 (explaining that the defendants paid these publications to post this content about them).  All this online content was accessible in the United States; at no time prior to the ICO pre-sale did Opporty attempt to differentiate between U.S. and foreign investors, or otherwise

---

[15] *See, e.g.*, Kinnaird Decl., Ex. 12, SEC12 Excerpts of Opporty Facebook Posts at 5 ("Opporty.Com Announces ICO and Token Sale Starting October 18th 2017."); *id.* at 7 ("Recently we announced our ICO project.  And Today we are taking leading positions among the strongest projects in the ICOwatchlist."); Kinnaird Decl., Ex. 13, SEC13, Excerpts of Opporty Tweets at 2 (announcing new Opporty ICO page).

limit the reach of any offshore component of its ICO to only non-U.S. persons.  At the very least, these efforts "could reasonably [have been] expected to have the effect" of "conditioning" the U.S. market for the sale of the OPP Tokens. 17 C.F.R. § 230.902(c).  Given that reasonable expectation, the Regulation S exemption is unavailable.  *Id.* § 230.903.

The defendants minimize these promotional efforts, calling them "isolated, limited contact within the United States" — simply "publishing a website" and "merely discussing a future securities offering in public."  Defs. Mem. at 15.  But these are exactly the types of conditioning efforts that contravene Regulation S.  *See* SEC Release No. 6863, 46 SEC Docket 52 (Apr. 14, 2990); *SEC v. Martino*, 255 F. Supp. 2d 268, 286 (S.D.N.Y. 2003) (finding that "marketing efforts such as mailings, directed communications in the United States designed to induce the purchase of securities" constituted directed selling efforts under Regulation S); *SEC v. Boock*, No. 09-CV-8261 DLC, 2011 WL 3792819, at *20 n.26 (S.D.N.Y. Aug. 25, 2011) (finding distribution of press releases in the United States to be directed selling efforts). Given that compliance failure, the sale of OPP Tokens to foreign purchasers must be integrated with the sale to U.S. purchasers, and the offering as a whole cannot satisfy any exemption.  *See* SEC Release No. 6863, 46 SEC Docket

52 (Apr. 24, 1990); SEC Release No. 33-9415, 78 Fed. Reg. 44771 § 4 (July 24, 2013); *cf.* 17 C.F.R. § 230.500.[16]

The circumstances of this case, moreover, support the conclusion that Opporty marketed and conducted the ICO, as a single transaction, to both U.S. and foreign investors alike. Among other facts, Defendants told the public that Opporty was conducting one Initial Coin Offering, and offered a "[t]otal number of tokens" at a uniform price of "0.0002 ETH per Token." SEC27, SAFT at -1319. Defendants filed a Form D notice of one offering of securities via SAFTs that raised $550,000, from both U.S. and non-U.S. investors. SEC 56.1 ¶¶ 126-29. Opporty's ICO Pre-Sale was marketed in the same way within the U.S. and globally. And for both U.S. and non-U.S. investors alike, the ICO occurred at the same time, *id.* ¶¶ 49, 52; used the same offering materials; and bound investors to identical SAFT terms, *id.* ¶ 57.

Thus, Defendants cannot claim a valid exemption under Regulation D or Regulation S, and their ICO pre-sale, without registration, violated Section 5.

---

[16] And the sales to non-U.S. purchasers are not protected by Reg. D. As the SEC points out (and defendants do not dispute), Opporty made no attempt to verify whether the 188 non-U.S. OPP Token purchasers qualified as accredited investors. The separate "know your customer" process Opporty conducted for these purchasers did not include verification of "accredited investor" status. *Id.* ¶¶ 66-67 (citing SEC28 and defendants' Amended Answer). As a result, Regulation D's exemption cannot apply with respect to these purchasers.

3.  <u>Defendants' Reliance on Counsel Defense</u>

A violation of Section 5 is a strict liability offense.  *See, e.g.*, *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 452 n.34 (E.D.N.Y. 2016); *SEC v. Cavanagh*, No. 98-CV-1818, 2004 WL 1594818, at *16 (S.D.N.Y. July 16, 2004) ("To prove a violation of Section 5, a plaintiff need not establish scienter."), *aff'd on other grounds*, 445 F.3d 105 (2d Cir. 2006); *see also SEC v. Schooler*, 905 F.3d 1107, 1115 (9th Cir. 2018) ("Section 5 is a strict liability statute so good faith reliance on counsel cannot preclude liability under the statute.").  Defendants nevertheless argue that the Court consider, as a defense, their good-faith reliance on outside counsel in structuring the ICO.  Defs. Mem. at 17–19.  This argument is unavailing.

"Compliance with federal securities laws cannot be avoided by simply retaining outside counsel to prepare required documents."  *SEC v. Enterprises Sols., Inc.*, 142 F. Supp. 2d 561, 576 (S.D.N.Y. 2001).  Instead, the Second Circuit has recognized a limited "advice of counsel" defense in civil securities actions *outside* the Section 5 context, when (and if) a defendant can show that: (1) "he made complete disclosure to counsel," (2) "sought advice as to the legality of his conduct," (3) "received advice that his conduct was legal," and (4) "relied on that advice in good faith."  *Markowski v. SEC*, 34

F.3d 99, 105 (2d Cir. 1994).  Even when the defense applies, and "where these prerequisites are satisfied, such reliance is not a complete defense, but only one factor for consideration."  *Id.*

At least one district court has held that this defense "provides no protection against a violation" of Section 5, precisely because it is a strict liability statute.  *Cavanagh*, 2004 WL 1594818, at *17, ("A defense of reliance on advice of counsel is available only to the extent that it might show that a defendant lacked the requisite specific intent."); *see also SEC v. Harwyn Indus. Corp.*, 326 F. Supp. 943 (S.D.N.Y. 1971) (finding Section 5 violation despite good faith reliance on counsel); *see generally SEC v. W.J. Howey Co.*, 328 U.S. 293, 300 (1946) ("[R]espondents' failure to abide by the statutory and administrative rules in making such offerings, even though the failure result [sic] from a bona fide mistake as to the law, cannot be sanctioned under the Act.").  This conclusion is eminently logical, and this Court adopts it.

In any event, Defendants' assertions — that they retained sophisticated securities counsel, prepared formal offering materials, and structured concurrent web-based offerings with different intake and verification methods, *see* Defs. Mot. at 18 — fall well short of satisfying the *Markowski* factors, even if they could be applied to an alleged violation of Section 5.  Defendants offer no evidence as to the

*completeness* of their disclosures to counsel.  Nor, for example,
do they make any showing about seeking or receiving advice on
whether Opporty's ICO marketing activities *prior to counsel's
retention* constituted "offshore transactions" or "direct selling
efforts" such that Regulation S could not apply.  *Cf. Martino*,
255 F. Supp. 2d at 285 ("[T]he advice received must be timely in
that the defendant must receive it prior to the illegal
conduct.).  As the SEC has explained, "[o]nce directed selling
efforts are begun, offers of the securities necessarily will
have commenced, if not before," SEC Release No. 6863, n.48 46
SEC Docket 52 (Apr. 24, 1990), making the defendants'
promotional efforts a part of the offer itself.

        In fact, according to Gryniak's deposition testimony,
Opporty did not retain Dilendorf Khurdayan, the law firm that
advised Opporty about the ICO, until January 2018.  Kinnaird
Decl., Ex. 1, SEC1, Grybniak Dep. Tr. 173:3-5.  This was after
the decision was made in the fall of 2017 to pursue an ICO pre-
sale, Grybniak Decl. ¶¶ 7-8, and after Opporty posted about the
ICO on various social media accounts and communicated about the
endeavor via articles and press releases, *see* SEC 56.1 ¶¶ 34-37.
Thus, the fact that Defendants hired and used securities
counsel, without more, does not preclude finding a violation of
Section 5 here.

*      *      *      *      *

For the foregoing reasons, the SEC's motion for summary judgment as to the Section 5 claim is granted as to both Opporty and Grybniak, and Defendants' summary judgment motion as to the SEC's Section 5 claims is denied.

## V.    The SEC's Motion for the Section 15 Violation

The SEC also brings a claim against Grybniak under Securities Act Section 15(b), for aiding and abetting Opporty's violation of Section 5.  That statute provides: "[A]ny person that knowingly or recklessly provides substantial assistance to another person in violation of [Section 5] shall be deemed to be in violation of [Section 5] to the same extent as the person to whom such assistance is provided."  15 U.S.C. § 77o(b).  To hold a defendant liable as an aider and abettor under this section, the SEC must prove: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation."  *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012).

As explained above, Grybniak is directly liable himself for violating Section 5.  Therefore, a claim against him for aiding and abetting this violation is duplicative of the Section 5 cause of action.  *Cf. In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 747 n.12 (S.D.N.Y. 2015) (holding

that a claim under Section 15(a) was duplicative of a claim for the underlying securities law violation).  Therefore, summary judgment is not appropriate as to this claim.

## VI.  Defendants' Summary Judgment Motion on the Section 10b-5 Claims

Both defendants move for summary judgment on the SEC's fraud claims under Exchange Act Section 10(b) and Rule 10b-5.  *See* Defs. Mem. at 21-24.  They assert that summary judgment is appropriate on these claims because the SEC has failed to raise even a genuine question of material fact as to misrepresentation, materiality, or scienter.  *Id.*  For the reasons set forth below, that motion is denied in its entirety.

## A.  Alleged Misstatements and Deceptive Acts

The complaint alleges that Opporty made four categories of materially false or misleading statements, or deceptive acts, to potential investors.  The following recitation sets forth the material facts undisputed by the parties, but is primarily drawn from the SEC's Counterstatement (for the reasons discussed above regarding the parties' 56.1 submissions).

### 1.  Statements That Opporty's ICO Was "100% SEC Compliant" And That OPP Tokens Were "SEC Registered"

Leading up to and during its ICO, Defendants made several statements on Opporty's social media pages that the OPP Tokens had been registered with the SEC and that Opporty's ICO

was "100% SEC compliant" and "SEC regulated." *See generally* SEC 56.1 Opp'n ¶¶ A-J, ECF No. 63.  For example, on January 18, 2018, Grybniak posted on Opporty's Telegram channel, "[f]or now we are 100% SEC compliant regulated ICO according to US laws." *Id.* ¶ B (citing SEC50 at 8).  Similarly, on February 8, 2018, Opporty stated on its Telegram channel, "Don't miss the amazing opportunity to participate in Opporty's SEC regulated presale!" *Id.* ¶ C (citing SEC52 at 17).  On the same day, an Opporty contractor posted on Opporty's Telegram channel, "Opporty is US company, which provide[s] SAFT-regulated presale and SEC registered tokens for everyone who have passed the KYC/AI verifications."  *Id.* ¶ D (citing SEC52 at 17).

Grybniak acknowledged that investors asked about the ICO's compliance with SEC regulations and whether the ICO was approved by the SEC, and "cared about whether Opporty's ICO was compliant with the securit[ies] laws"; and Defendants "wanted to provide [] transparency" in "talking to investors" and wanted to show they were "talking to government agencies."  *Id.* ¶ I (quoting SEC1, Grybniak Dep. Tr. 231:13-232:3; 235:4-12). Defendants made no attempt to remove or amend these statements until after the Pre-Sale ended on March 5, 2018, when Grybniak publicly stated that Opporty had *not* received "direct approval from [the] SEC."  *Id.* ¶ J.

2.  Statements About Opporty's "Verified Providers" and
    <u>Business Database</u>

Similarly, Defendants made numerous statements about the increasing number of "verified providers" — companies providing content and services, who had been "onboarded" onto Opporty's platform — as well as the number and nature of entries in its "business database." *See generally id.* ¶¶ K-V.

For example, on October 8, 2017, Grybniak told potential investors: "[w]e have already about 1,000 verified company profiles. . . . The main thing is that we know how to attract them so we need to just scale this process." *Id.* ¶ L. Likewise, on December 28, 2017, a Telegram user asked, "[d]o you think you can convince enough customers to join Opporty?" and "[h]ow do you plan to acquire customers and companies to use Opporty?", and Grybniak responded, "[w]e already have 1,000+ verified providers in the US." *Id.* ¶¶ O-P.

The Commission has adduced evidence, however, that only 155 companies had agreed (or even indicated a willingness) to be listed on, use, or contribute content on Opporty's platform when these statements were made. *Id.* ¶ W & n.6. Moreover, Opporty's "verified providers" were merely companies whose contact information Opporty had purchased, *id.* ¶ II, "manually verified," and then posted on Opporty's online platform.  The vast majority of "verified providers" had no role

or involvement in being listed on Opporty's platform. *Id.* ¶¶ X-Y. Defendants did not provide any explanation or description about Opporty's verification process when making the above statements. *Id.* ¶ AA.

Opporty's "verified providers" were a subset of entities from Opporty's database of U.S. "companies." *Id.* ¶ CC. In promoting its platform and ICO, Opporty represented its U.S. business database as containing over 17 million companies and published profile pages for each. *Id.* ¶¶ DD; EE; FF. The pages indicated that Opporty users could make "Offers" and submit "Requests" to these companies, regardless of whether the individuals and commercial and non-commercial entities were able or willing to transact business on Opporty's online platform. *Id.* ¶ FF, HH.

And the SEC marshals evidence to show that Grybniak purchased a database containing the 17 million entities' information in 2015, from a company called "USBizData," which had compiled the information. *Id.* ¶ II-JJ. Defendants never told investors during the ICO that its 17-million company database consisted of contact information purchased from a third party, rather than compiled by Opporty. *Id.* ¶ KK.

3. <u>Yelp User Ratings and Reviews</u>

The SEC also contends, and adduces evidence to demonstrate, that Opporty was deceptive in its use of Yelp

reviews on its own website.  SEC's Reply Mem. ("SEC Reply") at

34-35, ECF No. 60.  Opporty's contractors, at Grybniak's

direction and with his knowledge, scraped reviews and ratings of

various companies posted on the Yelp website and posted them on

Opporty's online platform.  SEC 56.1 Opp'n CS ¶ MM.  Before

posting Yelp reviews and star ratings on its platform, Opporty

altered the color of the Yelp-branded rating stars and omitted

the Yelp logo and all other attribution, in violation of Yelp's

terms and conditions.  *Id.* ¶¶ QQ-SS.  Defendants did not seek

Yelp's permission to use its reviews or ratings until January

2019, at which point Yelp directed Opporty to take them down.

*Id.* ¶¶ OO, TT-UU.  The SEC asserts that this practice was

misleading, as it created the false impression that Opporty had

users who were submitting reviews and ratings on Opporty's

online platform.  SEC Reply at 34-35.

    4.   Opporty's "Partnerships & Participations"

        In promoting Opporty's platform and soliciting ICO

investors, Defendants repeatedly made representations about

Opporty's "partnerships" and/or "participations" relationships

with various companies, including Microsoft Corporation.  *See*

*generally id.* ¶¶ VV-LLL.  For example, on October 18, 2017,

Opporty tweeted a link to an article discussing Opporty's ICO

and identifying Microsoft and other companies as "Partners."

*Id.* ¶ WW.  Defendants also identified these companies and used

their logos in the "Partnerships and Participations" section of Opporty's ICO promotional materials.  *Id.* ¶ CCC; DDD.

With the exception of Relief Defendant Clever Solution (Grybniak's company) and Microsoft, Opporty stated in response to the SEC's interrogatories that it had "no written agreements or specific oral terms" with any of the companies with which it entered into so-called "partnerships."  *Id.* ¶ EEE.  Instead, their relationship was "exploratory" in nature.  *Id.* ¶ FFF (quoting SEC1, Grybniak Dep. Tr. at 306:23-307:18).  But Defendants did not communicate this understanding to potential investors when representing those companies as "partners."  *Id.*

Even identifying Microsoft as a partner could reasonably be considered misleading, as that relationship was initially only an agreement for Opporty to use the Microsoft Azure cloud computing system.  *Id.* ¶ LLL.  Once Opporty was accepted into Microsoft's BizSpark program, the standard terms of this program explicitly did "not create an agency, partnership, or joint venture."  *Id.* ¶¶ HHH; KKK.

## B.   Legal Standards for Section 10b-5 Liability

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe."  15

U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b-5,

provides that it is unlawful to: (a) "employ any device, scheme,

or artifice to defraud"; (b) "make any untrue statement of a

material fact or to omit to state a material fact necessary in

order to make the statements made, in light of the circumstances

under which they were made, not misleading"; or (c) "engage in

any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person." 17 C.F.R

§ 240.10b-5. To establish liability under Section 10(b) and

Rule 10b-5, the SEC must demonstrate that a defendant acted with

scienter in making the material misrepresentation at issue (or

omission, if the defendant had a duty to speak). *See SEC v.*

*First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996).

  *Materiality.* Whether a misstatement or omission is

material "depends on whether there is a substantial likelihood

that a reasonable shareholder would consider it important in

deciding how to act." *ECA, Local 134 IBEW Joint Pension Tr. of*

*Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)

(quoting *TSC Indus., Inc. v. Northway*, *Inc.*, 426 U.S. 438, 449

(1976)). To be material, "a statement must, in the view of a

reasonable investor, have significantly altered the total mix of

information made available." *Plumber & Steamfitters Loc. 773*

*Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 100-01 (2d Cir.

2021). "Materiality is a mixed question of law and fact." *In*

*re All. Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 188 (S.D.N.Y. 2003). Thus, "[o]nly when the omissions are 'so obviously important or unimportant' to a reasonable investor 'that reasonable minds cannot differ on the question of materiality' is the issue 'appropriately resolved as a matter of law by summary judgment.'" *Id.* (quoting *TSC Indus.*, 426 U.S. at 450 (1976)).

*Scienter.* Scienter refers to "a mental state embracing intent to deceive, manipulate, or defraud." *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012). "[S]cienter may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016). Proof of scienter "need not be direct, but may be a matter of inference from circumstantial evidence." *Valicenti Advisory Servs., Inc. v. SEC*, 198 F.3d 62, 65 (2d Cir. 1999). "The Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) ("Whether a given intent existed is generally a question of fact, appropriate for resolution by the trier of fact."); *see Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 194 (2d Cir. 1998). In other words, "scienter issues are seldom appropriate

for resolution at the summary judgment stage." *SEC v. Cole*, No. 12-CV-8167, 2015 WL 5737275, at *5 (S.D.N.Y. Sept. 19, 2015) (collecting cases).

## C. Genuine Disputes of Material Facts Exist as to Each Category of Misrepresentations

The Defendants argue that summary judgment is warranted with respect to the Section 10b-5 fraud claims, as the SEC has not established (i) that the Defendants made any misrepresentations; (ii) that the statements alleged were material; (iii) or that the Defendants acted with scienter. Defs. Mem. at 21-25. As set forth below, Defendants fail to demonstrate that they are entitled to summary judgement on the SEC's Rule 10b-5 claims with regard to any category of alleged misstatements.

### 1. Statements That Opporty's ICO Was "100% SEC Compliant" And That OPP Tokens Were "SEC Regulated"

Defendants assert that Opporty's statement that its ICO was "SEC regulated" and its similar permutations were not unlawful because the statements were true, immaterial, and made without scienter. According to Defendants, the phrase "SEC regulated" was accurate and not misleading because Opporty's ICO was made under and complied with the SEC's "regulations." In any case, such a statement would not "have been remotely important to the vast bulk of ICO investors," who were foreign citizens located outside of the United States. Defs. Mem. at

22. Grybniak also could not have had scienter in making the relevant statements because English is not his native language; he attested that he "never had any intention of defrauding any investor." *Id.* at 23. Defendants also assert "Opporty received advice of counsel on this matter specifically," which is relevant to both the accuracy of the statements and Grybniak's scienter. *Id.* at 22. On the record before the Court, however, there are genuine disputes of material fact with respect to each of these three elements.

First, a reasonable jury could comfortably find that Opporty's statements regarding compliance with SEC regulations were false and misleading. This is true in particular of the defendants' multiple statements, leading up to and during the Pre-Sale, that Opporty's ICO was a "100% SEC compliant regulated ICO according to US laws." *See* SEC 56.1 Opp'n CS ¶ B. In one post on Telegram, Opporty's social media manager and contractor wrote: "Opporty is US company, which provide SAFT-regulated presale and *SEC registered* tokens." *Id.* ¶ D (citing SEC52 at 20 (Feb. 8, 2018 Post at 3:27:50 PM) (emphasis added). Grybniak concedes that these statements — at least when made before February 20, 2018 — were inaccurate and should not have been made (though he blames others for them, in certain cases). *Id.* ¶ F (citing Grybniak Dep. Tr. 218:7-13) ("[W]e should not have done that."). And for good reason: it is undisputed that the

OPP tokens were not, in fact, SEC-registered.[17]  *Id.* ¶ E (citing

Grybiak Dep. Tr. 136:20-137:4).  A potential investor might also

reasonably conclude that the statement that Opporty's ICO was

"SEC compliant" was false.  *See id.* ¶ G.

Second, there is (at least) a genuine factual dispute

as to materiality.  Defendants cite no evidence for their

assertion that these representations were "obviously

unimportant" to non-U.S. investors, who made up the vast

majority of OPP Token purchasers.[18]  To the contrary, the record

contains evidence suggesting that investors considered SEC

compliance to be material, because they were asking Grybniak and

Opporty about it.  As Grybniak testified during his deposition,

"people from the public were asking Opporty about whether the

ICO was approved by the SEC," and he "knew that potential ICO

investors cared about whether Opporty's ICO was compliant with

the security[ies] laws."  SEC 56.1 Opp'n CS ¶ I (citing Grybniak

Dep. Tr. 236:23-237:12).  In making these statements, Defendants

"wanted to provide the transparency" in "talking to investors"

and wanted to show they were "talking to government agencies."

*Id.* (citing Grybniak Dep. Tr. 237:4-12).

---

[17] Indeed, even in arguing that Opporty's statements were not
misleading, the defendants' memorandum does not address the representation
that the OPP tokens were "SEC registered."  *See* Defs. Mem. at 21-25.

[18] Separately, this argument fails to account for the undisputed facts
that Defendants promoted and marketed the ICO in the United States, SEC 56.1
¶¶ 31-43, and that six U.S.-based investors actually did participate in the
ICO, *id.* ¶ 52.

Third, there is a genuine factual dispute as to
Defendants' scienter.  Given that Grybniak was Opporty's sole
employee, the jury will have a firm basis on which to conclude
that he knew about the conduct and misrepresentations at issue —
not least because much of that conduct was his own.  Moreover,
the SEC has adduced sufficient evidence from which a reasonable
jury could conclude that Grybniak knew, or was reckless in not
knowing, that Opporty's ICO was not "100% compliant" with U.S.
securities laws at the time the statements were made.  *See* SEC
56.1 Opp'n CS ¶¶ F, G, I.  This includes the evidence that: (i)
Opporty had not registered its ICO; (ii) the SEC had not granted
"direct" or any other kind of "approval" — a fact Opporty did
not disclose until after the Pre-Sale, *id.* ¶¶ J-K; and (iii)
Opporty did not file its Form D until February 20, 2018, well
after he told investors the ICO was "100% compliant."  *Id.* ¶¶ B,
F.

The defendants' primary argument regarding scienter is
that Grybniak is "not a native speaker" of English and relied on
his attorney's use of the word "compliant" in making the
relevant statements about Opporty's ICO.  Defs. Mem. at 23.
This factual defense, however, depends on assessments of
Grybniak's veracity and credibility — determinations best left
to the finder of fact.  *See Stichting Ter Behartinging v.*

*Schreiber*, 407 F.3d 34, 55 (2d Cir. 2005) (assessments of credibility not properly resolved on summary judgment).

      2.    Statements About Opporty's "Verified Providers" and <u>Business Database</u>

As to Opporty's statements regarding its "verified providers" and business database, Defendants argue only that these representations were not false or misleading. According to Defendants, "Opporty differentiated explicitly between 'companies in the data-base' and 'verified company profiles,' explaining that these were all simply metrics to gauge Initial Stage Market Opportunity.'" Defs. Mem. at 23 (quoting Grybniak Decl. ¶ 28). These representations, Defendants argue, were "permissible, 'forward looking' statements." *Id.* at 23-24 (citing Grybniak Decl. ¶ 28).

Defendants fall well short of carrying their burden on summary judgment as to these statements. As the SEC points out, the bald assertion that Opporty differentiated between database companies and verified providers is irrelevant because the SEC alleges that Defendants made misleading statements with regard to both. *See* SEC Reply at 33-34 (citing SEC 56.1 CS ¶¶ L-R). More critically, Defendants altogether fail to engage with the undisputed record regarding the statements Opporty made to potential investors, and they include no case law or explanation

for their single-sentence argument that such statements were "forward-looking" so as not to be misleading.[19]

Indeed, based on the record before the Court, a reasonable jury could find that Opporty's statements regarding its verified profiles and company databases were misleading. "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

Here, potential investors were asking Defendants specific questions about Opporty's platform and the size and growth of its customer and company user base, including how many companies were on the platform at the time. *See* SEC 56.1 CS ¶¶ L-M. In response to these questions and in other instances, Defendants indicated that Opporty had more than a thousand "verified providers" — without also disclosing that the overwhelming majority of "verified providers" had no role or involvement whatsoever in being listed on the platform. *See id.* A reasonable jury could therefore find that Defendants' statements, when considered in context, gave potential investors the false and misleading impression that Opporty had

---

[19] The Court disregards this legal conclusion as it appears, in near-verbatim form, in Defendants' Local Rule 56.1 Statement and Grybniak's Declaration.

successfully attracted customers and companies who planned to use its platform.

3. <u>Use of Yelp User Ratings and Reviews</u>

Summary judgment is likewise denied as to Defendants' use of Yelp user ratings and reviews on Opporty's platform. Defendants assert that this alleged misappropriation cannot be "false or misleading." *See* Defs. Mem. at 24. In doing so, however, they fail to address the SEC's allegations that these actions were not misrepresentations or omissions in violation of Rule 10b-5(b) — but rather deceptive conduct or a fraudulent device in violation of Rules 10b-5(a) and (c). And Defendants cite to no evidence for their contention that "Opporty used the permissible API 'embedding' function offered by Yelp for [the] content." Defs. Mem. at 24. Instead, this bald assertion appears in Grybniak's declaration, *see* Grybniak Decl. ¶ 31, which likewise cites to no underlying source or material. To the contrary, evidence in the record suggests that Defendants' use of Yelp's content on the Opporty platform, with alterations and without attribution to Yelp, were not permissible, but violated Yelp's terms and conditions. *See* SEC 56.1 Opp'n ¶¶ MM-UU.

More broadly, the SEC identifies ample evidence demonstrating genuine disputes of material facts as to the deceptive and fraudulent nature of Defendants' conduct and their

scienter.  Defendants admit they used Yelp ratings and reviews
and posted them on Opporty's website without first obtaining
Yelp's permission, and that "substantially all" or "all but a
few" of the company reviews posted on Opporty's website came
from Yelp — and were not created or posted by actual Opporty
users.  SEC 56.1 Opp'n CS ¶¶ OO-PP.  A reasonable jury could
find that such conduct created the false and misleading
impression that Opporty had actual users provide ratings and
reviews of businesses on Opporty's platform — again, suggesting
more broadly that its product was growing when that was not the
case.  Defendants' alteration of Yelp's content and failure to
attribute it to Yelp — both in violation of Yelp's terms and
conditions — is likewise probative of deception and scienter.
*See SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) (Rule
10b-5(a) and (c) reaches "inherently deceptive" conduct).  While
Grybniak claims that Defendants' actions were simply "mistakes,"
SEC2, Grybniak Inv. Tr. at 203:11-23; SEC1, Grybniak Dep. Tr. at
285:4-15, that assessment is best left to the finder of fact.

   4.    Statements about Opporty's "Partnerships &
         Participations"

         Finally, Defendants assert that Opporty's
representations regarding its "partnership" and "participation"
with Microsoft were "factually correct," given its participation
in Microsoft's BizSpark accelerator program and later acceptance

in July 2018 into the "Microsoft Partner Network." Defs. Mem.
25. Defendants once again fail to demonstrate that they are
entitled to summary judgment as to these statements.

First, Defendants misapprehend the record in asserting
that Opporty only identified Microsoft as a partner after its
acceptance into the Microsoft Partner Network in July 2018. To
the contrary, the SEC points to an article, shared on October
18, 2017 through Opporty's Twitter page, discussing Opporty's
ICO and identifying Microsoft and other companies as "Partners."
SEC 56.1 Opp'n ¶ WW. Opporty also identified Microsoft and used
its logos in the "Partnerships and Participations" section of
its ICO promotional materials, including in its March 2018 One-
Pager and on the ICO landing page. *Id.* ¶¶ U, CCC.

Second, genuine issues of material fact remain as to
the misleading nature of Opporty's representations. *See*
*McMahon*, 900 F.2d at 579 (alleged misstatements judged by "the
ability of the material to accurately inform rather than mislead
prospective [investors]"). As the SEC points out, Defendants
concede that Opporty never entered into formalized agreements
with any of the companies that it identified as "partners." SEC
56.1 Opp'n CS ¶¶ EEE, JJJ, LLL. Grybniak instead testified that
what Defendants meant when they used the term "partnerships" and
"participations" during the ICO was not a formal commercial
relationship, but an "exploratory" relationship where Opporty

and the companies had a "mutual desire" to "explore some business opportunities." *Id.* ¶¶ FFF.  Despite the lack of formal relationships, Defendants identified those companies as "partners" and "participants" and used their logos in Opporty's promotional and marketing materials, without first seeking or obtaining permission.  *Id.* ¶¶ III.  This included use of Microsoft's logo, in direct contravention of Microsoft's "Internet-posted terms and conditions." *Id.* ¶ JJJ.  Taken together, a reasonable jury could find that Defendants' representations as to its "partnerships" and "participations" gave the false and misleading impression that Opporty was successfully partnering with high-profile companies, lending additional credence to Opporty's project and ICO.

## D.  **Defendants' Article III Standing Defense Fails**

The Defendants make the additional — and borderline frivolous — argument that the SEC lacks standing to pursue fraud claims without proof of "reliance, causation and harm to investors."  Defs. Mot. at 21.  The defendants frame this as an Article III problem, citing *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021).  Defs. Mem. at 20-21.

The defendants have not raised a colorable jurisdictional question, and their argument has no other merit. Standing works differently for government agencies.  The Constitution charges the Executive with the responsibility to

"take Care that the Laws be faithfully executed."  U.S. Const.
Art. II., Section 3.  The Securities Exchange Act created the
SEC, prohibited the employment of manipulative or deceptive
devices in connection with the purchase and sale of securities,
and gave district courts jurisdiction over actions "instituted
by the Commission" in response to violations.

     *TransUnion* — which involved a class of private
litigants bringing claims for damages against private defendants
— altered none of this, in respect of reliance or otherwise.
The Second Circuit has repeatedly held that the SEC "does not
need to prove investor reliance, loss causation, or damages in
an action under Section 10(b) of the Exchange Act, Rule 10b-5,
or Section 17(a) of the Securities Act."  *SEC v. Credit Bancorp,
Ltd.*, 195 F. Supp. 2d 475, 490-91 (S.D.N.Y. 2002); *see, e.g.*,
*SEC v. North Am. Research & Dev. Corp.*, 424 F.2d 63, 84 (2d Cir.
1970) (reliance not an element of a Rule 10b-5 claim in the
context of an SEC proceeding); *Berko v. SEC*, 316 F.2d 137, 143
(2d Cir. 1963) (reliance, loss causation and damages not
relevant); *see also Lorenzo v. SEC*, 587 U.S. 71, 84 (2019)
("[T]he Commission, unlike private parties, need not show
reliance in its enforcement actions."); *SEC v. Jarkesy*, 144 S.

Ct. 2117, 2126 (2024) ("And the SEC may levy these penalties even when no investor has actually suffered financial loss.").

Because an SEC enforcement action "is a creature of statute, legislatively authorized under" the Exchange Act, *see SEC v. Rana Rsch., Inc.*, 8 F.3d 1358, 1363 (9th Cir. 1993) (citing *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 808 (2d Cir.1975)), the standing elements applicable to private parties are "legally irrelevant", *See Berko*, 316 F.2d. at 143, to the Commission. "The Commission's duty is to enforce the remedial and preventive terms of the statute in the public interest, and not merely to police those whose plain violations have already caused demonstrable loss or injury." *Berko*, 316 F.2d at 143.

The Defendants' motion for summary judgment on the Section 10b-5 claims is therefore denied.

## VII. Conclusion

For the reasons set forth above, the SEC's motions for summary judgment against Grybniak and Opporty are granted as to its Section 5 claim, but denied as to the Section 15(b) claim. Defendants' motion for summary judgment is denied.


SO ORDERED.


 /s/ Eric Komitee
ERIC KOMITEE
United States District Judge

Dated:      September 24, 2024
            Brooklyn, New York